# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 7, 2011 Session

## STATE OF TENNESSEE v. NOURA JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
No. 05-06767     Chris Craft, Judge

---

**No. W2009-01709-CCA-R3-CD  - Filed December 10, 2012**

---

The defendant, Noura Jackson, was convicted of second degree murder for the death of her mother, Jennifer Jackson, and sentenced to twenty years and nine months in the Department of Correction.  On appeal, she argues that the trial court erred in the following rulings:  (1) concluding that her conversation at the scene with a family friend, who is an attorney, was not subject to the attorney-client privilege; (2) concluding that the searches of the residence she shared with the victim and of a vehicle parked in the driveway were lawful; (3) allowing testimony of lay witnesses as to her use of "drugs"; (4) allowing testimony of her having sexual relations at a time after the murder, as to her eviction from an apartment after the murder, and as to her hospitalization at Lakeside Hospital after the murder; (5) allowing the victim's brother and sisters to testify as to arguments between the defendant and the victim prior to the murder; and (6) allowing certain photographs of the crime scene and the victim's body.  Additionally, the defendant argues that she is entitled to a new trial because of (7) prosecutorial conduct consisting of references to the post-arrest silence of the defendant; suppression of the third statement of a State's witness; loudly beginning its opening statement by saying, "Give me the f*cking money"; using a misleading PowerPoint presentation during its closing argument; commenting on her right to remain silent; references to the Deity during closing arguments; commenting in closing argument on the length of the trial; treating as established facts which were not proven at trial; making personal attacks during closing statements upon her; and making additional improper statements during closing argument.  Further, the defendant argues on appeal that (8) the evidence is insufficient to support her conviction for second degree murder and that (9) the court erred in imposing more than a minimum sentence.  We have carefully reviewed the record and conclude that the arguments of the defendant are without merit.  Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court.  JEFFREY S. BIVINS, J., filed a concurring opinion, in which THOMAS T. WOODALL, J., joined.

Valerie T. Corder (on appeal and at trial); Arthur Quinn (at trial), Memphis, Tennessee, for the appellant, Noura Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Amy P. Weirich and Stephen P. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the June 2005 murder of the defendant's mother, Jennifer Jackson, for which the then eighteen-year-old defendant was indicted on one count of first degree premeditated murder. Following a jury trial in February 2009, the defendant was convicted of the lesser-included offense of second degree murder. In our consideration of this matter, we first will set out the extensive trial testimony.

James Tual testified that he and the victim attended a wedding on the evening of June 4, 2005, and were together until about 11:30 p.m. He learned of the victim's death the following morning.

Regina Frierson, an employee of First Tennessee Bank, testified regarding the victim's account records for June 2005. The records reflected a purchase on the victim's credit card at the Cockeyed Camel restaurant at 11:06 p.m. on June 4, 2005. The card was not used again after that purchase.

Mayo Josiah Cocke testified that he lived across the street from the victim and that during the early morning hours of Sunday, June 5, 2005, he and his wife were awakened by "loud banging" at their front door. When his wife opened the door, Cocke heard the defendant repeatedly yelling, "[M]y mom, my mom. Somebody's breaking into my house." He grabbed his pistol for protection, ran to the victim's house, and followed the defendant inside. The defendant went directly to the sunroom located in the back of the house and called 9-1-1. Cocke asked the defendant where the victim was, and the defendant, who was crying and hysterical, replied that the victim was in her bedroom. Cocke found the deceased victim, who was nude and covered in blood, lying on the floor in the bedroom. The victim's bed was also covered in blood. Cocke immediately ran back to his house and told his wife that the victim had been murdered. Cocke and his wife then returned to the victim's house where they found the defendant still on the telephone with the 9-1-1 operator. Mrs. Cocke took the telephone from the defendant who was "all curled up on the floor." Cocke noticed bloody shoe prints and drops of blood next to the prints on the kitchen floor. The window in a kitchen door leading to the garage was broken, and glass was on the floor in the kitchen.

Cocke saw the defendant's Jeep Cherokee in the driveway.

Cocke said that, the weekend before the victim's death, the victim and the defendant went out of town and the victim asked him to "keep an eye" on the house while they were gone. That weekend, he saw between twenty and forty teenagers go into the victim's backyard with beer bottles. The police were called to investigate, but no one answered the front door. The police tried unsuccessfully to open the gate to the backyard, and the teenagers quickly dispersed, jumping over the fence and running across the street. After the police left, the teenagers returned but left soon thereafter.

Rachael Cocke, Josiah Cocke's wife, testified that at approximately 5:00 a.m. on June 5, 2005, the defendant, who was wearing a long-sleeve, gray "zipper hoodie," came to her house screaming, "[M]y mom, my mom, there's someone breaking . . . into my house." She said that the defendant was hysterical and "very sweaty." Mrs. Cocke called 9-1-1, and Mr. Cocke went to the victim's house but soon returned, screaming, "[S]he's been murdered." Mr. and Mrs. Cocke went to the victim's house and found the defendant "rocking and wailing" in the sunroom with the telephone in her lap. Mrs. Cocke took the telephone and spoke to the 9-1-1 operator. At the operator's instruction, Mrs. Cocke went to the victim to render aid but realized there was nothing she could do and informed the 9-1-1 operator that CPR would not help the victim. She said that the victim appeared to have been dead for "quite a while." Mrs. Cocke saw no movement in the victim's chest, and the look on the victim's face was "fixed and . . . dead." She said there were bloody footprints in the hallway leading to the victim's bedroom.

Sheila Cocke, Josiah Cocke's mother, testified that in June 2005 she lived with her son and daughter-in-law across the street from the victim's residence. She recalled an argument she overheard between the victim and the defendant that occurred one evening after the defendant's eighteenth birthday in March 2005. Ms. Cocke was outside walking her dog at about 9:00 p.m. when she heard the defendant and the victim arguing in their driveway. The defendant, who was in a rage, told the victim, "[J]ust give me the F'ing money," and the victim told the defendant to be quiet and go inside. Ms. Cocke also recalled another argument sometime in the spring of 2005 when the defendant told the victim, "Give me the money. I want the money." The victim replied, "I will. I will." Ms. Cocke said that, on the morning of the victim's murder, she went to the victim's residence to comfort the defendant. She sat with the defendant as police officers inquired about her whereabouts that morning, and the defendant "never gave the same answer twice."

Officer Russell Tankersley of the Memphis Police Department testified that he responded to a robbery call at the victim's residence at approximately 5:15 a.m. on June 5, 2005. He said that it was unseasonably hot that morning and estimated the temperature at ninety to ninety-five degrees. Upon his arrival at the scene, the defendant came out of the

house "yelling that something [was] wrong with her mom." The defendant was wearing "a sweatshirt or a fleece type jacket," which Officer Tankersley thought was odd due to the warm weather. Inside the house, Officer Tankersley noticed blood in the hallway, in the doorway of the victim's bedroom, and on the victim's bed and discovered the victim lying on the floor in front of the foot of the bed. The defendant then came running into the house, screaming, "[M]y mom, my mom," and Officer Tankersley asked another officer to take her outside. In the kitchen, officers found broken glass on the floor beside a door leading into the garage. The defendant told the officers that she was tired and wanted to go to sleep.

Michelle Hulbert, a firefighter/paramedic with the Memphis Fire Department, testified that she and her partner responded to the call at the victim's residence on June 5, 2005. A fire truck with four men also responded to the scene. Hulbert found the nude victim lying on the floor with multiple stab wounds to her head, neck, and chest. Hulbert had to remove a wicker basket that was covering the victim's head, neck, and upper chest in order to examine her. The victim's mouth was full of blood, and she was not breathing. Hulbert placed a cardiac monitor on the victim to check for electrical activity in her heart, but there was none. She said the victim's body felt cool, but she did not take the victim's core temperature. She pronounced the victim dead at 5:18 a.m. Hulbert identified photographs of the victim's body. Hulbert recalled the defendant's making a statement in response to a question from a police officer that "her mother's boyfriend was an asshole but he wouldn't do something like this."

Officer David Payment, a crime scene investigator with the Memphis Police Department, testified that he responded to the victim's residence at approximately 5:45 a.m. on June 5, 2005. He first walked the perimeter of the residence and noticed the vehicles in the driveway. He saw what appeared to be blood on the front porch and front door and put on gloves and "footies" before entering the house. He requested that special equipment be brought to the scene and that Officers Kay Turnmire, Ricky Davison, and Lloyd Thomas respond to the scene as well. Officer Payment explained that items and locations containing possible blood were sprayed with either Hungarian Red or Coomassie Blue, chemicals which cling to biological fluid "so it can be photographed and later lifted" with a gel lift and preserved as evidence. He said that the chemical products were new to the police department and that he used the products for the first time at the victim's residence but did not use them again after that day because he did not like the results. He identified several items of evidence, including a pair of shoes; a wooden footstool; a wicker basket; a light switch cover from the victim's bedroom; a piece of an envelope containing possible hair obtained from the stepstool; an envelope containing a piece of blue plastic obtained in the victim's bedroom; a condom wrapper found on the floor next to the victim's bed; the victim's bed and mattress, as well as the sheets, pillows, and pillowcases that were on the bed; a comforter found on the floor next to the victim; a pillow found underneath the victim's bed; closet doors from the victim's bedroom; broken shards of glass; a silver-colored kitchen knife with

-4-

a black handle; a golf club; and a white kitchen door.

According to Officer Payment's crime scene log, twenty-two people entered the victim's residence between the time he arrived at 5:45 a.m. and when he left the scene at 3:00 p.m. He explained that the collection of evidence was a team effort with him and Officer Davison taking photographs and Officer Turnmire documenting the evidence. He acknowledged that he personally did not take any notes and that Officer Turnmire's handwritten notes were subsequently destroyed after the team made a hard copy of their report. Officer Payment said he returned to the crime scene at about 7:00 a.m. the following day.

Officer Payment estimated that over 200 photographs were taken at the crime scene and identified photographs of the victim's body and those made in the kitchen depicting a knife on the countertop next to the sink, a knife and a golf club on another countertop, and a knife block with two empty slots. He acknowledged that the entry hall was not the original location of two sets of shoes that were photographed. He identified photographs of the dirt in front of the gate leading to the backyard and agreed that some of the photographs showed some type of impressions but said he did not take any casts or lifts of the impressions. He also identified photographs of the hall bathroom showing a hair dryer and what appeared to be blood on the floor.

Officer Payment said that the investigation team used a Krime Sight Imager, "a non-invasive body fluid, fingerprint detection," throughout the victim's house, but no fingerprints with ridge details were detected, only smudges which would not be recognizable. He said that shoe print lifts in the hallway were taken after the victim's body had been removed by two people who had a crime scene officer in front of them and another officer behind them, "guiding them so they would not step on what [was] considered possible evidence." Officer Payment identified photographs depicting the bloody sheets on the victim's bed and what appeared to be a bloody shoe print on the bottom sheet. He explained that one of the bloody pillows in the victim's bedroom had "[d]ifferent types of patterns[,] [p]ossible pooling[,] [s]mears[,] [b]lood spatter. It was a combination and I was trying to document with photographs the different patterns." He said that he put on a different pair of gloves every time he touched a piece of evidence and sent the condom wrapper found in the victim's bedroom for fingerprint analysis.

Officer Ricky Davison of the Memphis Police Department Crime Scene Investigation Unit testified that he had worked "up in the hundreds" of crime scenes and met Officer Payment at the victim's residence on June 5, 2005. When he arrived, the scene had been taped off and photographs were being taken by Officers Payment and Turnmire. He said there was no forced point of entry at the residence, and the doors and windows were locked. He observed what appeared to be blood on the front porch and blood spatter on the front

door. Swab samples were collected from the porch area and the door. He said that a cat later discovered inside the house was captured and removed. Officers found bloodstains and possible shoe prints on the floor in the hallway. Samples of what appeared to be blood were taken in the hallway and the bathroom located off the hallway. Numerous items of evidence were collected from the victim's bedroom. Officer Davison said that the condom wrapper found in the victim's bedroom was discovered the next day while officers were conducting an additional search for evidence and after the victim's bed and other items had been moved. He said that the officers processed the condom wrapper, doorways, countertops, doorknobs, sinks, and other surfaces for fingerprints. Unidentified fingerprints were lifted from the condom wrapper and a Blackberry box found in the kitchen.

Sergeant Connie Justice of the Memphis Police Department Homicide Unit testified that she transported the defendant to the homicide office on Sunday, June 5, 2005, to obtain a witness statement from her. The defendant was not in custody or Mirandized and rode in the front seat of Sergeant Justice's unmarked police cruiser. The defendant fell asleep during the thirteen to fourteen-minute drive to the homicide office, and Sergeant Justice had to awaken her when they arrived. Sergeant Justice took a typewritten statement from the defendant at 8:35 a.m., which the defendant initialed and signed at 9:53 a.m.

In her statement, the defendant said that, the evening of Saturday, June 4, she had gone to the Italian Festival, Carter Kobeck's house, a party in Germantown, and then to Perry Brasfield's house. The defendant called the victim from her cell phone at 12:10 a.m. while at Brasfield's house. Their conversation lasted about five minutes, and the defendant was told by the victim that she was going to bed. The defendant said that she stayed at Brasfield's house for about thirty minutes after her conversation with the victim and that Richard Raines, Sophie Cooley, and Brooke Thompson then took her to her car. She next went to buy cigarettes and to Taco Bell and, realizing that she did not have her wallet, called Brasfield and asked him to look around his house for it. She returned to Kobeck's house, found her wallet, bought gas, and drove to Eric Whitaker's house in Cordova but decided to go home instead. She talked to Andrew Hammack on the phone, and he was going to come by her house to see her kitten. She was supposed to call Hammack when she got home, but she found "what [she] found and [she] didn't get to call him." She did not know what time she arrived home but thought "it was in between four and five [a.m.]."

The defendant further said that she entered the house through the front door which was locked and went into the kitchen to get her cat. She stepped on something that cracked and realized that glass was all over the floor. Asked what she did next, the defendant explained:

> I walked into [the victim's] room and I took the basket off of her head. I tried to talk to her but she wouldn't talk. Then I tried to feel a pulse. I kept shaking

her.  Then I ran out the front door to my neighbor's house and got them.  And I was screaming.  And they followed me back. . . .  And then I ran into the sunroom to call the cops from the land phone.  And then I went in the kitchen and sat on the floor and I was holding my cat screaming, just waiting for them to get there.

The defendant said that she turned on the light in the hallway but did not remember if she had turned on the light in the victim's bedroom.  The light in the victim's bathroom was on and the victim's bedroom door was open, although she usually slept with the door closed.  The defendant said that she was alone when she arrived home and denied that anyone had come to her house before she discovered the victim.  Asked about the victim's valuables, the defendant said that the victim had a "high tech cell phone" that she used at work and usually had cash in her wallet.  She denied having any recent arguments with the victim other than "the same kind that teenagers and mothers" have.  She said that the victim was disappointed with Perry Brasfield for throwing a party at their house the weekend she and the victim were out of town and that he had been allowed in the house because he was feeding their dog while they were away.  The defendant said that the victim had "an on and off again boyfriend," Mark Irvin, and they were broken up at the time of her death.  She said that Irvin had spent the night with the victim "[a] lot of times" and that he and the victim often exchanged "[h]eated words," but their arguments were not physical.  The defendant acknowledged that she had blood on her shoes and that she had touched the victim's face and arms.  The defendant said she wiped her hands on some beach towels near the telephone in the sunroom.

The defendant also said that she had cut her left hand near the thumb on broken beer bottles at the Italian Festival on Friday night and that she went to the festival on Saturday night as well.  The defendant said that the victim had gotten her some "adhesive stuff" to put on the cut.  Sergeant Justice asked the defendant how bad the cut was and if it needed stitches.  Sergeant Justice said that the defendant did not appear intoxicated or "spaced out on drugs" at the time she gave her statement.

Sergeant Justice said that she took photographs of the defendant to document what she was wearing and collected her shoes because they had blood on them.  She identified photographs she took of the defendant's gray New Balance shoes.  She also took photographs of the defendant's hands, including the bandage which appeared to be a piece of tape.  She said that the defendant was cooperative, "but when it came to the particular point about the extent of her injury, . . ., it seemed that she did not want to expose her bandage or answer any questions about her specific injury."  She said that the defendant never mentioned going to Walgreens that morning.  Officers at the crime scene asked Sergeant Justice to obtain a consent to search the defendant's vehicle.  The defendant signed a consent to search form for her vehicle at 10:50 a.m. and also gave consent for a saliva sample to be taken from her.  The

sergeant drove the defendant back to the victim's residence and returned the defendant's purse, keys, and cell phone to her. A woman on the scene gave Sergeant Justice a gray hoodie that had been dropped in the yard.

Sergeant Justice said that the following day she called the defendant to inquire about some of the phone numbers on her cell phone records and to confirm the time line of events. In their discussion regarding Taco Bell, the defendant would not commit to which location she had gone to and then "broke down and . . . started crying, and she goes, well, I didn't want you to think that I was a bad person, but I didn't really go to Taco Bell, and instead, I just rode around and I smoked a bowl of weed." The next day, two days after the defendant had given her statement, the defendant called Sergeant Justice wanting to know if there were any developments in the case and that was Sergeant Justice's last communication from her. Sergeant Justice said that buccal swabs were also obtained from Andrew Hammack and Mark Irvin. She also made photographs of the defendant's hands and entire body while the defendant was in the hospital.

Officer Patricia Turnmire of the Memphis Police Department Crime Scene Investigation Unit testified that she assisted the other officers at the crime scene by documenting what they were doing and taking photographs. She was at the scene on June 5, 2005, from approximately 7:10 a.m. until 5:30 p.m. and tagged into evidence the gray sweater and New Balance tennis shoes the defendant was wearing. The defendant's package of cigarettes and lighter and two black-handled knives were also collected into evidence. Officer Turnmire returned to the scene the following day and assisted Officer Davison with fingerprinting and documentation. She identified a photograph showing "a portion of the victim's bed along with the placard forty-six" which depicted what appeared to be a broken wooden crate found underneath the bed.

Officer Turnmire said that on June 10, 2005, she went to a hospital and took photographs of the defendant's left hand, feet, and a small bruise on her left thigh, as well as an overall body shot. She identified photographs of the defendant's left hand depicting what appeared to be a healing cut.

Officer Turnmire said that she participated in the search of a 2000 Jeep Cherokee at the crime scene office on June 19, 2005. She identified photographs of the vehicle depicting the interior and the license plate and identified a white skirt that was found in the trunk area. Other evidence collected from the Jeep included a Q-tip swab, forty-five cents in change inside a Walgreens plastic bag, a paper towel with an unknown substance, three empty Skin Shield packages, and Nexcare bandages and paper tape, all of which were found in the rear trunk area underneath clothing. Two floor mats and fluid samples were also collected into evidence.

On cross-examination, Officer Turnmire acknowledged that the defendant consented to a search of the house and all of the vehicles on the property the day of the victim's murder. She said there were "tons" of clothing in the Jeep Cherokee that she later searched. She acknowledged that the defendant was in the hospital when the search was executed on the Jeep Cherokee. She said that the Krime Sight Imager was used in the hall bathroom and that there did not appear to be any blood spatter or blood smears in the shower. Officer Turnmire said she noted in her report that there appeared to be a bloody footprint in the upper left corner of the bottom sheet on the victim's bed.

Lieutenant Mark Miller of the Memphis Police Department Homicide Unit testified that he was the case coordinator and arrived at the crime scene at 6:45 a.m. The defendant's purse and phone were inside the house and were collected into evidence. He returned to the scene a few days later and found two cordless telephones in the defendant's bedroom. Lieutenant Miller determined that the last number dialed from one of the phones was Andrew Hammack's number and that the last number on the defendant's cell phone was Hammack's number. He later had Sergeant Connie Justice photograph some New Balance shoes that were brought into his office by several of the defendant's friends who appeared "slightly incoherent." He spoke to Hammack about the shoes, and Hammack gave a statement.

On cross-examination, Lieutenant Miller said that he had never taken shoe prints for elimination and that he did not direct any of the crime scene officers to do so at the victim's residence. He acknowledged that Perry Brasfield was not "totally forthcoming" when he gave his first statement to the police and that he gave another statement.

Thomas Helldorfer, a retired homicide investigator for the Memphis Police Department, testified that he had been involved in over 1200 death investigations and was in charge of the crime scene at the victim's residence. When he arrived on the scene, seven or eight officers, including Crime Scene Officer David Payment, were already there. He saw the defendant standing in the front yard with Genevieve Dix. He put on boots and gloves and conducted a "walk through" of the victim's residence, looking for evidence. Investigator Helldorfer noticed what appeared to be blood on the front porch and door and in the foyer, kitchen, hallway, hallway bathroom, and the victim's bedroom. The window in a kitchen door had been broken out, and glass was all over the floor. He went into the hallway bathroom and noticed that the bathtub, shower, and sink were wet. He found the victim's body in her bedroom between the foot of the bed and the wall. Investigator Helldorfer said that the victim's body was not removed from the scene until about 4:00 p.m., explaining that the officers "tried to work [their] way in towards where [the victim] was to collect the evidence and gather it and photograph it before [they] were going to disturb it to bring [the victim] out." Investigator Helldorfer also walked the exterior of the house and observed that the possible points of entry were secure. He said that consent to search the defendant's Jeep Cherokee was obtained at 10:50 a.m. and that the search was conducted "[s]ometime after

that." A total of 810 photographs and a videotape were made during the investigation.

Investigator Helldorfer said he returned to the scene again on June 17, 2005, looked inside the defendant's Jeep Cherokee, and saw a Walgreens bag in plain view in the back of the vehicle. The defendant's vehicle was towed to the crime scene tunnel and searched.

Sergeant William D. Merritt of the Memphis Police Department Homicide Unit testified that he was assigned to assist Sergeant Helldorfer inside the victim's residence and to check the perimeter of the residence for possible evidence. He said that the defendant did not immediately sign a consent to search form but eventually did so at 7:51 a.m. on June 5, 2005. He said that the victim's house keys were never found. He collected into evidence a sales receipt for a gasoline purchase made at the All-In-One store at 6646 Poplar on June 5, 2005, at 4:20 a.m. and identified the security videotape he obtained from the store. He subsequently returned to the victim's residence and found some condoms in a table beside the victim's bed and in a box in the defendant's bedroom. He said that he decided to submit the condom wrapper found in the victim's bedroom for fingerprint analysis, rather than DNA analysis, because it had a plastic-type surface and the fingerprint database was larger than the DNA database. Sergeant Merritt also collected a sales receipt for cigarettes purchased from the BP gas station at 4830 Poplar Avenue dated June 5, 2005 at 12:46 a.m. bearing the defendant's signature. On August 15, 2005, he examined the defendant's sweatshirt that had been collected into evidence and found a folded napkin inside a front pocket. He noticed "some red spotting" on the napkin that "looked out of the ordinary" and submitted the napkin to the TBI for DNA testing.

Sergeant Merritt said he participated in the search of the defendant's vehicle at the crime scene office on June 19, 2005. Inside the vehicle, officers found a Walgreens sack containing first-aid supplies, including "a Next Care First Aid Gentle Paper Tape[,] . . . an empty box[,] Next Care Bandage Drops Liquid Bandage[,] . . . [and] "Skin Shield Liquid Bandage, container." As a result, he contacted the twenty-four-hour Walgreens store located at the corner of Poplar Avenue and Massey Road and, after relaying the bar code information to the store manager, learned that the items found in the defendant's vehicle had been purchased during the early morning hours of June 5, 2005. He met with the store manager and viewed the video surveillance for the time the medical supplies were purchased, approximately 4:01 a.m., and obtained a copy of the sales receipt showing the time and a list of the items that were purchased. He recognized the defendant on the Walgreens surveillance tape as the purchaser of these items.

On cross-examination, Sergeant Merritt acknowledged that the defendant gave consent to search her vehicle, to give her fingerprints and a saliva sample, and for her hands and body to be photographed. He said that the defendant was given back the keys to her vehicle the afternoon of the victim's murder. He further acknowledged that blood found at

the crime scene indicated that the victim's attacker may have been injured. He opined that, based on the severity of the victim's injuries, she did not leave her bedroom after she was stabbed and that the perpetrator may have been cut, left the residence, and dropped some blood on the front porch. He acknowledged that he used the information he obtained from Katherine Menkel in support of his affidavit for the search warrant of the defendant's vehicle.

Agent Linda Littlejohn of the Tennessee Bureau of Investigation ("TBI"), accepted by the trial court as an expert in microanalysis footprint examination, testified that she examined a pair of tennis shoes, three gel lifts, two pairs of sandals, and CDs containing approximately 669 photographs of the crime scene. She narrowed down the photographs to those that pertained to impression evidence and determined that nine of the impressions left at the scene had a similar tread design to the tennis shoes she examined.

On cross-examination, Agent Littlejohn acknowledged that she did not receive any original evidence from the crime scene and that the best way to evaluate evidence is to have the original evidence. She also agreed that if impression evidence was not properly recovered, important details of the impression would be lost and the examination results might be affected. As to one of the crime scene photographs depicting a bloody impression, Agent Littlejohn said that because it was not an examination quality photograph, she could not "tell if there was any detail present in that impression." As to another photograph depicting a bloody imprint, she determined that tread design was present but inconsistent with any of the shoes she examined.

Qadriiyyah Debnam, a special agent/forensic scientist specializing in DNA serology with the TBI, testified that she examined numerous items of evidence sent to her by the Memphis Police Department, including nail clippings from the victim's hands; the victim's sexual assault kit; saliva samples from the defendant, Andrew Hammack, and Mark Irvin, from which she obtained DNA profiles; a pair of New Balance tennis shoes; a gray, pullover, long-sleeved jacket; and a golf club. The victim's sexual assault kit was negative for the presence of semen. Samples taken from the victim's front door, front door mat, entryway, a piece of glass from the kitchen, hallway, and the bathroom floor off the hallway revealed the presence of blood which matched the victim's DNA profile. Agent Debnam also examined the wicker basket found in the victim's bedroom which revealed the presence of blood that matched eight of thirteen loci of the victim's DNA profile. The victim's blood was also found on, among other things, a stepstool, a purse, a piece of wood, pillows, pillowcases, sheets, and the comforter from the victim's bed. Agent Debnam tested four areas from the top sheet of the victim's bed. The DNA profile obtained from one area was a "mixture of genetic material where the major contributor of the profile [was] from an unidentified female individual." The defendant was excluded as a major contributor, but the victim could not be excluded as a minor contributor. Agent Debnam had no opinion as to

-11-

when the mixture of the blood for the major contributor and either the blood, skin cells, or saliva from the minor contributor occurred. She agreed that it was possible that the blood from the major contributor was on the sheet prior to the mixture occurring. A mixture of two DNAs was also found on one of the pillowcases she examined, but Agent Debnam had no way of determining when the DNA was left on the pillowcase or when the mixture occurred.

Agent Debnam said that tests revealed the presence of the defendant's blood on a white napkin found in the pocket of a gray sweatshirt she received from Sergeant Merritt on August 17, 2005. Agent Debnam also examined a pair of tennis shoes which revealed the presence of blood matching the victim's DNA profile at twelve of thirteen markers on the sole of the right shoe and at seven of nine markers on the right shoestring and at seven of thirteen markers on the sole of the left shoe and the left shoestring.

On cross-examination, Agent Debnam acknowledged that the defendant's DNA was not present on the pillows, pillowcases, sheets, footboard, headboard, or finials of the victim's bed; the light switch; or the fingernail scrapings taken from the victim's hands. She said that there was ridge detail in the blood on the footboard of the victim's bed and that she notified the Memphis Police Department of her finding. She acknowledged that she was not asked to perform a DNA analysis on the condom wrapper found in the victim's residence.

Officer Martin Milner of the Memphis Police Department Crime Scene Unit, accepted as an expert in fingerprint identification, testified that his expertise was in the identification of friction ridge on the palmar side of hands and feet. The lifts he received for analysis in the case were compared against the victim, the defendant, Andrew Hammack, Rachel Cocke, Mark Irvin, and McKenzie Koale Madison. Madison's prints were found on two drinking glasses. He examined the ridge detail in blood that the TBI agent noticed on the footboard of the victim's bed, but it was a minute amount and he was unable to compare it against anyone. On cross-examination, Officer Milner said that neither the victim's nor the defendant's fingerprints matched the fingerprint on the condom wrapper.

Dr. Karen Chancellor, the chief medical examiner for Shelby County, testified that she performed the autopsy on the victim's body and determined that the cause of death was multiple stab wounds. The victim had approximately fifty stab wounds to the front and back of her body, neck, and arms, as well as many cut wounds.[1] The maximum depth of the stab wounds was six inches, and Dr. Chancellor estimated the width of the knife used at one-half to three-quarter inches. Dr. Chancellor collected nail clippings from the victim's hands; a

---

[1]Dr. Chancellor explained that a cut wound differed from a stab wound "in that a cut is generally longer on the surface of the body than it is deep. A stab wound is generally deeper into the body than it is in the width on the skin."

sexual assault evidence kit; and some loose hairs, which she noted as long and blonde,[2] found in the victim's hands. Dr. Chancellor identified several photographs of the victim's body. She grouped the stab wounds according to where they were located but could not determine in what order the wounds were inflicted. Two of the wounds to the chest area passed through the right ventricle of the heart and one passed through the left ventricle. Dr. Chancellor opined that the wounds to the victim's chest were made as the knife was at a ninety-degree angle to the body. The group of wounds to the abdomen involved the stomach, liver, and aorta. The wounds on the front of the right shoulder involved the right lung. The victim had seven to eight "side to side" stab wounds on her neck, one of which went through the cricoid cartilage. Wounds on the victim's face included a sharp force injury to the forehead that went down to the bone, a sharp force injury with a V-shaped end on the cheek, and a cut wound on the chin which was a pattern injury, indicating that the wound was likely caused by a sharp instrument with a serrated edge. Additionally, the victim had stab wounds to the left shoulder, both hands, right arm, and right wrist, as well as cuts on the back of the fingers of the left hand and the palm of the right hand. She said that the wounds on the victim's hands, especially the palmar surfaces, were consistent with defensive wounds. It was Dr. Chancellor's opinion that most of the wounds were made with a single-edged knife. The victim also had a pinkish, purple contusion on the left side of her head, which Dr. Chancellor opined was caused by a blunt object and was a recent injury.

Dr. Chancellor said that a forensic anthropologist, Dr. Love, assisted her in the victim's autopsy and examined certain portions of the victim's ribs. Dr. Love's examination indicated that the stab wounds to the ribs were inflicted by a non-serrated, sharp-edged weapon. Dr. Chancellor opined that two knives could have been used or a knife with an unusual configuration, such as a sharp edge on one side and a serrated edge on the other. As to the cut wounds on the victim's neck, Dr. Chancellor said that she could not "imagine anything else other than a serrated knife causing this."

Cindy Eidson, the victim's sister, testified that the victim was thirty-nine years old at the time of her death. She said that the victim and the defendant spent Memorial Day weekend of 2005 at Eidson's home in Florida. She recalled an "all night" conversation between herself, the defendant, and the victim that weekend wherein the victim told the defendant that she wanted her to go to boarding school because she was not taking the tests in her home schooling program and was "partying all the time." Eidson said the victim "figured [the defendant] was eighteen years old and still ha[d]n't finished [the] eleventh grade and that she needed to either go to boarding school or move out." The defendant said "nothing" in response to the victim's accusations. The victim received a telephone call on Saturday evening of that weekend informing her that several teenagers were having a party at her house in Memphis. The victim confronted the defendant about the party, and the

_____

[2]Dr. Chancellor testified that the victim had long blonde hair.

defendant denied any knowledge of it. However, the next day the defendant admitted that she knew about the party, and the defendant and the victim had a "heated" argument. Afterwards, "everything was really cold . . . and distant" between the victim and the defendant. The defendant and the victim left Eidson's home on Monday morning.

After she learned of the victim's murder, Eidson asked the defendant where she had been that night. The defendant said that she had been out all night with "Chris" but had told Perry Brasfield that she was at home outside smoking a cigarette because she did not want Brasfield to know that she was with Chris. Eidson said that by the time of the victim's funeral, the defendant had been hospitalized but did attend the funeral. The defendant remained hospitalized for about a month, and, upon her discharge, Eidson and other family members rented an apartment for her. Eidson and her sister, Grace, paid all of the defendant's expenses until she was arrested. After the defendant's arrest, Eidson asked her where she was at the time of the victim's murder. Eidson explained that she did so because she was taking care of the defendant at the time and

> would have gotten her lawyers or anything she needed if she had an alibi and could prove to me where she was and who she was with when [the victim] was murdered. And [the defendant] said, I don't know. And I asked her again, where were you during all of this? Who were you with? And [the defendant] said, I don't know.

Grace France, the victim's sister, testified that the defendant called her between 6:00 and 7:00 a.m. on June 5, 2005, saying that "something terrible ha[d] happened" to the victim. The victim's neighbor, Sheila, then got on the telephone, screaming hysterically that the victim had been stabbed to death. The next day, France flew to Memphis from her home in Atlanta, Georgia, and asked the defendant to go with her to the police station "to try and figure out what [was] going on with all this," but the defendant refused to go. After France later had left the police station, she called the defendant and offered to pick her up, but the defendant insisted that she stay another day at Kathy Menkel's house because her friends were there. The following day, France picked up the defendant at Menkel's house. Because the defendant was wearing an oversized, long-sleeved gray polar fleece jacket and flip-flops, France took her shopping for clothes and tennis shoes. The defendant told her that the victim had bought her some tennis shoes while they were in Florida and that she wanted to get them from the house, a request France thought was strange because the shoes were part of the crime scene and had blood on them. While shopping, the defendant picked out only long-sleeved shirts which, due to the hot weather, France thought was odd. After they finished shopping, France and the defendant went to the hotel where France and Eidson were staying. France described the defendant's demeanor during this time as "[v]ery to herself. Didn't really want to be with us. She . . . would beg, can my friends come pick me up. Wanted to be with her friends." France later asked the defendant about the cut on her hand, and the

defendant told her she had burned her hand while cooking.

France said that, after the defendant was released from the hospital, she and Eidson rented an apartment for her and paid all of her living expenses. The defendant told France that she was not going to live in "a five to six hundred dollar a month apartment" because she was used to living in a nice house, so the family spent more money to get her a nicer apartment. France said the defendant still had access to the victim's residence at that time. Asked about the appearance of the victim's house at the time of her death, France said that the victim "had a lot of stuff and very little room to put it all in." The victim also had numerous items in four storage units.

On cross-examination, France acknowledged that some of the items in the storage units belonged to the defendant's father, who was killed about fifteen months before the victim's murder. France gave items of property belonging to the defendant to Bill Shelton, a friend of the victim, since the defendant was incarcerated at that point. She acknowledged that she had filed a civil lawsuit against the defendant. Asked about the victim's relationship with Mark Irvin, France said it was an "on again, off again[] relationship, that lacked consistency."

Eric Sherwood, the victim's brother, testified that about two or three months before the victim's murder, the defendant admitted to him that she smoked marijuana. Sherwood said that the victim hosted a birthday party for him on May 21 at her residence, and the defendant arrived late for the party. The victim told the defendant that her "eyes look[ed] glazed over" and that she "look[ed] high." The victim wanted the defendant to take a drug test. The defendant denied using any drugs, and the party resumed without further discussion.

Sherwood said that he accompanied the victim and the defendant on their Memorial Day weekend trip to Florida to visit his sister, Cindy Eidson. During the drive to Florida, the victim told the defendant that her drug test indicated she had drugs in her system. The defendant denied using any drugs, and the victim told her they would "deal with it" when they returned to Memphis. While they were at Eidson's house in Florida, the victim received a telephone call from Joe Cocke stating that several people were having a party at her house in Memphis. The victim was upset because there had been a party there six months earlier. The defendant denied any knowledge of the party. The victim told the defendant that she was "going to have to send [the defendant] off to either boarding school or military school," and the defendant replied that she would "just go off to the military."

Sherwood said they left Eidson's house on Monday, and as they were driving, the victim received a phone call from one of her clients about selling a bond. The defendant asked the victim about the number of bonds she sold and how much money she made. The

victim told the defendant that the defendant was on her life insurance policy and a 401(k) policy and that she would be "well taken care of if something happened to [the victim]." Sherwood said that shortly after the Florida trip, he had dinner with the victim and the defendant at the victim's residence. The victim and the defendant discussed the vehicles from the estate of the defendant's father. The victim told the defendant that if she was able to sell the vehicles, the proceeds would be used for the defendant's college education or, if the defendant did not go to college, the proceeds would be used for back child support the defendant's father owed the victim. The defendant became upset and said, "[T]hat was my father's cars, and the money goes to me."

Sherwood said that he went to the victim's residence after he learned of her murder, and en route he listened to his voicemail messages on his cellular telephone. The defendant had left a message saying that "something [had] happened" and asking him to call her back. He saw the defendant at the victim's residence the morning of the murder but did not talk to her. He said he visited the defendant twice a week while she was in the hospital and asked her more than once if she had any ideas about the victim's death, and the defendant "basically just put her head down and wouldn't say anything." During one of his visits, Sherwood asked the defendant about the wound on her hand. The defendant said she had cut it on barbed wire while jumping a fence at the Italian Festival. During another visit about a week later, Sherwood again asked the defendant about the wound, and the defendant told him she had burned her hand on the stove. After the defendant's discharge from the hospital, Sherwood subsequently helped her move into an apartment at the complex where he worked. He told the defendant that "she needed to try to find a job to keep her occupied," and the defendant replied, "I'll just go into selling pills or whatever." He saw three or four different pills and a clear, hard plastic straw with white residue at the defendant's apartment when he was moving furniture.

Sherwood said that after the defendant's arrest, he was at the victim's house where he found the victim's wallet containing her driver's license, social security card, bank debit card, and a Focal Company card in the sunroom in a plastic bin.

On cross-examination, Sherwood said that the victim had dated Mark Irvin for about three years before her death and that he had met Irvin on a few occasions. He acknowledged that he, the victim, the defendant, and Irvin had keys to the victim's residence. She sometimes kept a spare key underneath a flower pot on the front porch.

Alexandra Kline testified by video deposition that she had been friends with the defendant since eighth grade and that they both had attended Ridgeway High School. During her junior year, the defendant started attending a different school and their friendship "kind of died off." However, about two weeks before the victim's death, the defendant returned to Ridgeway High School, and they started "hanging out again."

-16-

Kline said she and the defendant went with others to the Italian Festival on the Friday night before the victim's death. She did not remember the defendant's falling while at the festival but acknowledged that she was not with the defendant the entire time. She and the defendant spent most of the next day, Saturday, swimming at Koale Madison's house. Kline and the defendant left Madison's house around 5:00 or 6:00 p.m., and the defendant drove Kline home. Kline then went to a friend's house and did not go out that night. She acknowledged that the defendant called her several times that night wanting her to "come out and party," but she did not go. After she learned of the victim's death, she went to the victim's house around noon. She did not notice an injury to the defendant that day but sometime later noticed "a scar" on the defendant's hand.

Kline recalled that after the victim's funeral the defendant lived in an apartment in Collierville. During the time the defendant lived in the apartment, Kline and the defendant went to a party at Daniel Novak's farm where over 100 people had gathered. She and the defendant drank beer at the party. She had seen the defendant drink alcohol at her apartment "maybe once" but acknowledged that the defendant's apartment was "a place to drink."

Sophie Cooley testified that she attended parties with the defendant during their teenage years and that they often drank alcohol and used drugs. Cooley and the defendant frequently smoked marijuana together at the defendant's house when the victim was not home, including in 2005. She had seen the defendant snort cocaine sometime in 2003, but not in 2005.

Cooley said that on Saturday, June 4, 2005, she, Brooke Thompson, and Kirby McDonald went to Carter Kobeck's house "[t]o party, to hang out with friends." The defendant and her ex-boyfriend, Perry Brasfield, were also there. Cooley saw the defendant take three Lortabs and explained that she knew the pills were Lortab because she had seen them before. Cooley said she did not see a cut or bandage on the defendant's hands that night. The defendant was wearing a yellow tank top, knee-length white skirt, and gold sandals. Shown the white skirt collected from the trunk area of the defendant's vehicle, Cooley said that it appeared to be the skirt the defendant was wearing at the party at Kobeck's house. Cooley said she and Thompson went to Perry Brasfield's house later that night in McDonald's car and recalled sitting outside with Thompson, Brasfield, McDonald, and Richard Raines. The defendant arrived later and was "more quiet than normal." Cooley, Raines, Thompson, and the defendant subsequently left Brasfield's house in Raines's car. Raines drove the defendant back to Kobeck's house to get her Jeep Grand Cherokee before taking Cooley and Thompson to Cooley's home. Brasfield and "Joey" came to Cooley's house sometime after 1:30 a.m. and stayed until about 5:30 a.m.

Cooley said that she learned of the victim's murder later that morning and went to the victim's residence to comfort the defendant. The defendant was wearing a heavy, long-

sleeved jacket, which Cooley thought was odd since it was summer time. She talked to the defendant while the defendant sat inside Regina Hunt's car with the door open, and Cooley noticed a small ziplock bag containing "[v]ery, very, many" Lortabs in the defendant's hands. Cooley later saw the defendant at Hunt's house and described her demeanor at that time as "[j]ust not very emotional. Just upset but not overly upset." Cooley noticed a small, white bandage on the defendant's left hand.

McKenzie Koale Madison testified that he had known the defendant since middle school and that she had dated his best friend, Perry Brasfield. He had seen the defendant use drugs, including marijuana, mushrooms, and cocaine. In the year before the victim's death, Madison spent about every other day with the defendant. He said they smoked marijuana together "[q]uite often." He said that he, Brasfield, Joey McGoff, and eight to ten others were at the party at the victim's residence Memorial Day weekend 2005 when the victim and the defendant were out of town. They sat in the backyard and smoked marijuana and drank from about 4:00 p.m. until the police showed up. The defendant and Alexandra Kline came to his house the following Saturday, June 4, and he did not see a cut on the defendant's hand. They all left Madison's house about 3:00 p.m. and stopped by Kline's house before driving to the defendant's residence. Upon seeing her mother's car in the driveway at her house, the defendant did not want to go home, so they went to Eastgate Shopping Center "to check out some parking" for the Italian Festival. They returned to the defendant's residence, and he drank two or three beers while waiting for the defendant to get ready. He asked the defendant for a glass of water which he left on the counter or in the sink. They left the defendant's residence in her Jeep Grand Cherokee at about 4:30 p.m. and went to Carter Kobeck's house which was "right around the corner from the Italian Festival." They stayed at Kobeck's house for approximately three hours, and by then they "had a pretty nice buzz because [they] had been sitting there drinking and smoking weed in the back yard." He said he and three or four others decided to walk to the Italian Festival, but the defendant did not go with them. He later "bumped into" her at the festival and saw her again between 10:30 and 11:00 p.m. as he was leaving. He did not notice a cut or a bandage on her hand that night.

Madison acknowledged that he had been arrested in September 2005 for criminal trespass, resisting official detention, public intoxication, and disorderly conduct and that the charges had been dismissed. He further acknowledged that he had been arrested again in May 2007 for violation of financial law, reckless driving, DUI, and refusal to submit to a blood-alcohol test and that he had been convicted of DUI from that case. Madison said that his telephone number was 901-237-2530.

Kirby McDonald testified that she was a high school friend of the defendant and that she and the defendant often smoked marijuana. She said that on Saturday night, June 4, 2005, she, the defendant, Sophie Cooley, Brooke Thompson, Koale Madison, Clark Schifani,

Brad Reedie, Richard Raines, and Perry Brasfield were "hanging out" at Carter Kobeck's house. She acknowledged that neither Kobeck nor his parents were home and that she and her friends were drinking beer. She also took a fourth of a Xanax bar. McDonald said that the defendant had gotten an acrylic French manicure that day and showed her nails to McDonald. She took the defendant by the hand to admire her nails and did not see a cut on them. The defendant was wearing a long, white skirt; a yellow tank top with gold beading; and gold sandals with rhinestones that night. While at Kobeck's house, McDonald, the defendant, and other girls were discussing their mothers and when the defendant's mother's name came up, the defendant said, "[M]y mom's a bitch and she need[s] to go to hell." The defendant did not give any details, and McDonald thought "[i]t just seemed like a teenager saying something about their mom, being in an argument with them, and being mad."

McDonald said that everyone left Kobeck's house to go to a party in Midtown after Kobeck's grandmother came and kicked them out of the house. The defendant did not ride with McDonald, but she was in the caravan of cars that left to go to the party. The party had already ended when they arrived, so McDonald, Cooley, and Thompson went to Perry Brasfield's house in Germantown, arriving there between 10:00 and 10:30 p.m. About ten people from the group at Kobeck's house also came to Brasfield's house. The defendant arrived at Brasfield's house about twenty to thirty minutes later and had changed clothes, wearing a dark denim skirt and black sandals. When McDonald left Brasfield's house at about 11:30 p.m., the defendant was still there.

Brooke Thompson testified that she rode with Kirby McDonald and Sophie Cooley to Carter Kobeck's house on the night of June 4, 2005, arriving there at approximately 7:30 p.m. The defendant arrived there in her vehicle about thirty minutes later, wearing a white skirt and yellow top. Thompson identified a photograph taken on her cell phone at Kobeck's house depicting the defendant wearing a white skirt. Thompson drank beer that night but did not see anyone using drugs. She estimated that about twenty-five to thirty people were present at Kobeck's house and they were there for one to two hours. The group then left to go somewhere in Midtown, but some ended up at Perry Brasfield's house, including Thompson, McDonald, Cooley, and the defendant. Thompson estimated that she left Brasfield's house around midnight with Richard Raines, Cooley, and the defendant. Raines took the defendant to her car at Kobeck's house and then took Cooley and Thompson to Cooley's home. When they took the defendant to her car, she was wearing the same top she had on earlier but had changed into a dark bluejean skirt with a ruffle at the bottom. Thompson did not notice a cut on the defendant's hands that night.

Thompson said that after she learned of the victim's murder the following morning, she went to Regina Hunt's house, where about thirty teenagers had gathered. Cooley and the defendant were there, and Thompson saw a cut on the defendant's left hand toward the thumb that was covered with a white bandage. She did not ask the defendant about the cut.

Joey McGoff testified that he was a high school friend of the defendant and had visited her home about ten times. He had seen her use marijuana, Lortab, alcohol, and, once, cocaine. He said that the defendant smoked marijuana "[p]retty frequently," and he had smoked it with her on multiple occasions. He acknowledged that he had taken Lortabs and said he had seen the defendant take them at her house two or three times. He visited the defendant at her apartment after the victim's murder about ten times and drank alcohol and smoked marijuana there with her. At the apartment, he also saw her take Lortabs one time.

McGoff said that he saw the defendant at Carter Kobeck's house on Friday and Saturday nights before the victim's murder. He said that the defendant went to the Italian Festival on Friday night, but he went elsewhere. He said that on Saturday night he and Clark Schifani left Kobeck's house to go to Midtown to look for a party but ended up at Brasfield's house. Also at Brasfield's house were Koale Madison, the defendant, Brooke Thompson, Kirby McDonald, and Richard Raines. He did not notice any injuries or bandages on the defendant's hands that night. Around 1:30 a.m., he and Brasfield went to Sophie Cooley's house to "hang out" with Cooley and Thompson. McGoff and Brasfield left Cooley's house at about 5:00 a.m. and returned to Brasfield's house. He learned of the victim's death at about 8:00 a.m. and went to the victim's residence where he saw the defendant but did not talk to her. He identified a photograph depicting what the defendant was wearing when he saw her that morning – a gray, pullover, long-sleeved sweater and light-colored denim skirt.

Caroline Giovannetti testified that she had known the defendant since seventh grade and saw her at the Italian Festival on the Friday night before the victim's death. The defendant was with Alexandra Kline and two other girls and did not appear to be intoxicated. Giovannetti next saw the defendant on the day of the victim's murder when the defendant asked her to keep her dog for a few days. As they were driving to Giovannetti's house, Giovannetti asked the defendant where she was during the time of the murder, and the defendant responded that she "got dropped off at [her] car and . . . drove past [her] house at midnight and saw that all the lights were out. And so, [the defendant] assumed [her] mom was [a]sleep, so [she] just kept driving, and . . . went over to Eric Whitaker's. And then, came home around four or five and found [her] mom." While at Giovannetti's house, the defendant took a shower and changed clothes. Giovannetti noticed a Band-Aid about two inches long and one inch thick on the defendant's hand. When she asked the defendant about the injury on her hand, the defendant "just shrugged it off." She and the defendant subsequently went to Regina Hunt's house where about twenty people had gathered. Giovannetti said that she stayed at Hunt's house until about 6:00 p.m. and, while there, the defendant said she wanted to go to a movie or go shopping that night. She said there was a discussion at Hunt's house about the cut on the defendant's hand, and the defendant said that she had cut it on a beer bottle at the Italian Festival and that she was drunk at the time.

Ronald Perryman Brasfield testified that his friends called him "Perry" and that the defendant was his ex-girlfriend. He said that he and the defendant used alcohol and drugs together "[m]any" times while they were dating. He snorted cocaine for the first time with the defendant and had used it "a few times" with her at her house and at parties. In the year preceding the victim's murder, Brasfield saw the defendant "most every day, every other day," and they used marijuana and alcohol frequently during that time. He saw the defendant use Xanax "[v]ery rarely" before the victim's death. He visited the defendant after she moved into her apartment "a dozen times," and saw marijuana, cocaine, and Lortab being used. He said he had two telephone numbers at the time of the victim's murder, one of which was 901-xxx-5xxx.

Brasfield said that the victim gave him a key to her house so he could feed the dog and water the plants while she and the defendant were in Florida the Memorial Day weekend before the victim's death. He admitted that he hosted a party at the victim's house on Saturday of that weekend but said no one went inside the house that evening. He called the victim and the defendant while they were in Florida to apologize. When the victim and the defendant returned home, Brasfield immediately gave the key "probably" to the defendant because the victim "wasn't too happy with [him]."

Brasfield said that on the night of June 4, 2005, he, the defendant, Eric Whitaker, Koale Madison, Joey McGoff, and others were partying at Carter Kobeck's house. Brasfield and the defendant had "[a] bad conversation that went sour" about him being there with another girl, and the defendant slapped him in the face. The party ended when Kobeck's grandmother arrived. Brasfield, the defendant, Joey McGoff, Sophie Cooley, Brooke Thompson, Kirby McDonald, and others then left in multiple vehicles to find another party but ended up at Brasfield's house where they sat around the swimming pool and drank. The defendant left Brasfield's house around midnight, saying "she had to get to her house." Everyone else left also except McGoff. The defendant called Brasfield shortly after she left, wanting to talk about them getting back together. He also received a text message from her around 1:00 a.m., saying that she wanted to get back together. Brasfield denied that the defendant called and asked him about a purse or wallet. Brasfield and McGoff subsequently went to Sophie Cooley's house and Brooke Thompson was there. After staying at Cooley's house a few hours, Brasfield and McGoff returned to Brasfield's house. The next morning, he learned of the victim's murder and went to the victim's house to see the defendant. The defendant "seemed all right" and was walking her dog. He noticed a bandage on the defendant's hand that had not been there the night before. The defendant told him she had cut her hand on some broken glass inside the house while chasing her cat. Brasfield said that, after the defendant was arrested, he asked her what she was doing at the time of the victim's murder, but the defendant did not answer him.

-21-

Clark Schifani testified that he and fifteen to twenty others, including the defendant, were partying at Carter Kobeck's house on the night of June 4, 2005. Kobeck's grandmother arrived and broke up the party. Schifani left with Joey McGoff to find a party in Midtown but ended up at Brasfield's house. He left Brasfield's house at approximately 11:15 p.m. and went home. The defendant was still at Brasfield's house when he left. He learned of the victim's murder the following morning. He said that his telephone number at that time was 901-xxx-2xxx and that he received a call from the victim's house telephone line at 12:59 a.m. and a missed call from the defendant's cell phone at 1:09 a.m.

James Spearman, a security manager and custodian of records for AT&T, testified that a phone call was placed from the victim's house telephone to Clark Schifani's phone number on June 5, 2005 at 12:59 a.m. and that the call lasted 5.8 seconds.

Susan Johnson, the custodian of records for T-Mobile, testified that the account for cellular telephone number 901-xxx-4xxx was in the victim's name, but she did not know who the user was. The records for the early morning hours of June 5, 2005, reflected outbound phone calls at 1:08 a.m and 3:18 a.m., an outbound text message at 1:13 a.m., an incoming text message at 2:11 a.m., and an outbound text message at 3:34 a.m.

John Eric Whitaker testified that he and a friend, Hunter Dean, were at his house during the early morning hours of June 5, 2005, and that he did not go out the previous evening because he was "grounded." The defendant called him around 3:00 or 4:00 a.m. on June 5, wanting "to come over and hang out." The defendant arrived at his house at about 4:30 a.m. as he was leaving to take Dean to his house down the street. The defendant was in her Jeep Cherokee at the bottom of the driveway, and he rolled down his car window to ask her if she wanted to ride with him to take Dean home. The defendant declined and said that she was "going to go meet up with some people." Whitaker estimated that the defendant was at his house two or three minutes.

Andrew Hammack testified that in June 2005 he and the defendant were "friends with benefits." He said that he talked to the defendant "[b]etween ten and twelve"[3] on the night of June 4 and that the defendant wanted him to meet her at her house, but he did not do so. He talked to the defendant again around 4:00 a.m. when she was on her way back from "Eric's" house, and the defendant wanted him to meet her at her house, but he did not go. He said that he received a text message from the defendant at about 5:00 a.m., saying she wanted to talk to him. After learning of the victim's death, Hammack saw the defendant at Regina Hunt's house. Hammack said he gave two statements to the police, explaining that he gave the second statement a few days after the first because he had his "nights mixed up,

_____

[3]Later in his testimony, Hammack said that his first conversation with the defendant occurred "between twelve and two."

so I think the second statement was the more clear statement."

Hammack identified a pair of New Balance shoes but said they belonged to Garrett Perryman who was living with him and others at the time of the victim's murder. He said that he wore the shoes when he came to the police station to give his first statement on June 7, 2005. Hammack said that a group of his friends later brought the shoes to the police station.

On cross-examination, Hammack admitted that he was intoxicated the night of June 4 and said that he attended a party with Ryan Grisham. Grisham took him home between 11:00 and 11:30 p.m., and he then drove Bucky Schultz to his house on White Station Road so Schultz could meet his 12:30 a.m. curfew. He stayed at Schultz' house for about two hours. He acknowledged that, in his first statement, he said he talked to the defendant between 11:00 p.m. and 1:00 a.m. when she was on her way home from a party and told him to meet her at her house in fifteen minutes. He denied going to the defendant's house.

On redirect examination, when asked if the defendant's cell phone records reflected that the defendant called him at 4:47 a.m., 5:00 a.m., 5:01a.m., 5:02 a.m., 5:03 a.m., and 5:06 a.m. on June 5, Hammack said that he did not remember if he talked to her all of those times and that he was probably asleep.

Genevieve Dix, an attorney, testified that she had known the victim, who was her best friend, since 1993. After learning of the victim's death on the morning of Sunday, June 5, 2005, she went to the victim's residence shortly before 8:00 a.m. She saw the defendant sitting outside in front of the house and noticed that she had on "a very odd outfit." Dix explained that the defendant, who usually "dressed in really lovely clothes, . . . whatever was fashionable," was wearing a gray, long-sleeved sweatshirt, a denim mini-skirt, and gray New Balance tennis shoes. She hugged the defendant who "just stood there. She had her sweatshirt pulled down . . . to her knuckles and she had her arms straight at her side." Dix noticed that the defendant did not smell like smoke even though she was a smoker and was not wearing makeup even though she normally had on heavy eye makeup. The defendant told her that she had gotten home about 4:00 a.m. but did not say anything else.

Dix said that as she was making telephone calls on the sidewalk, a detective approached her and told her that the defendant wanted to talk to her. She told the detective that she was an attorney, but she was not there in that capacity; she was there because the victim was her best friend. The police wanted the defendant to sign a consent to search, but the defendant wanted to talk to Dix. Dix and the defendant walked down the driveway fifteen to twenty feet, and the defendant asked her about the consent to search form. Dix told the defendant, "I don't know what it is. I do not practice criminal law. I've never seen a consent to search form before in my life. I can't explain it to you. I don't know. And I don't

represent you." The defendant asked Dix five or six times if the police could "get in [her] car," and Dix told her she did not know. She told the defendant, "[W]hat I can tell you is, sooner or later, they're going to get into anything, if they have to go downtown and get a search warrant, I'm sure, if you don't cooperate, they're going to go get a search warrant, but I don't know what they're planning on doing. Quite frankly, I don't know why they're not already in there." Her conversation with the defendant lasted about two minutes, and the defendant decided to sign the consent form. Dix also signed the form "as a witness only." Dix said that the defendant was "an extremely smart, intelligent" person and had no trouble understanding her that morning. Dix said that it "was clear that [the defendant] was concerned about them getting in her Jeep Cherokee," and she repeatedly asked Dix about it. Dix told the defendant she did not have to sign anything, but the police would eventually get into anything they wanted. She asked the defendant what was in her car that she was so worried about, and the defendant told her she had "a bong pipe" in the car.

Dix said that one to two hours later she had another conversation with the defendant after Perry Brasfield arrived. She told the defendant that Brasfield had said she called him from her house at about 12:30 or 1:00 a.m. Dix reminded the defendant she had told Dix that she did not get home until 4:00 a.m. The defendant said that the victim had called her and told her to come home, but she knew the victim was probably asleep and when she drove by the house, the lights were off. The defendant kept driving and went to a boy's house where she "smoked pot" with him in the driveway until 4:00 a.m. and then went home.

On cross-examination, Dix acknowledged that the victim had been dating Mark Irvin but said their relationship was "kind of on an iffy footing" at the time of the victim's death.

Patty Masterson testified that she had known the victim for ten or twelve years and that her daughter and the defendant were childhood friends. After learning of the victim's death on June 5, 2005, she went to the victim's residence at about 9:30 a.m. The defendant was not there when she arrived, but Masterson saw her walking down the sidewalk about thirty minutes later. She hugged the defendant, and the defendant asked her, "[I]s all of this going to be on the news?" She noticed that the defendant was wearing a gray, long-sleeved sweatshirt with a white, long-sleeved shirt underneath. She told the defendant that she must be hot in those two long-sleeved shirts because the weather was "excruciatingly hot" that morning. The defendant then took off the top sweatshirt and threw it on the ground. Masterson picked up the sweatshirt and gave it to a detective.

Regina Hunt testified that she attended church with the victim and the defendant, who had attended the same school as her children in 2004-2005. Hunt owned a sandwich shop in 2005, and the victim and defendant often came there. In 2005, Hunt observed the defendant talk to the victim "very disrespectful, ugly" on numerous occasions. Hunt said that the defendant came to her shop during school hours at least once a week, and she related a

conversation she had with the defendant about a week before the victim's murder. The defendant told Hunt in the presence of Perry Brasfield and Clark Schifani about the party that Brasfield had at the victim's house while they were out of town and that the victim was considering getting a restraining order against Brasfield and was "drug testing" her. The defendant was angry.

Hunt said that after she learned of the victim's murder she went to the victim's residence around 8:00 a.m. She talked to the defendant who told her that she felt uncomfortable because several of the victim's friends were in the yard across the street and that she wanted to leave. Hunt drove the defendant to her sandwich shop, but when they pulled up, they saw Brasfield, Schifani, and Joey McGoff inside and the defendant immediately told Hunt to leave because she did not want to see them. Hunt drove to the back of her shop and took the defendant inside to her office and made her a sandwich. They then returned to the victim's residence where the defendant got a bag out of her Jeep. Hunt drove the defendant to Caroline Giovannetti's house because the defendant wanted to take a shower. Joey McGoff was there, and he and the defendant "went in the back." When they returned, the defendant's hair was wet and they both smelled like marijuana. Hunt, the defendant, Giovannetti, and Brooke Thompson left to go to Hunt's house and the defendant asked her to stop at Memorial Park Cemetery so she could visit the gravesite of her friend, Anna Menkel. Hunt said that the defendant cried at the gravesite but had not been crying when Hunt arrived at the victim's residence. They then went to Hunt's house, and the defendant told her she wanted to have a party. Hunt told her that was not a good idea, and the defendant then said she wanted to go to a movie. Hunt told her that they were not going anywhere, and the defendant walked away to another part of the house. Other friends of the defendant came to Hunt's house and stayed until about 11:00 p.m. Hunt acknowledged that she looked through the defendant's purse and found a prescription bottle in the name of "Robert something." The bottle also had "Concerta" on it and contained twelve to twenty tablets "with little speckles on them." When Hunt confronted the defendant about the prescription bottle, the defendant told her that it was a prescription for Lortab that her doctor had prescribed for her. Hunt told the defendant "she needed to quit filling [her] full of crap and tell [her] . . . where she got them." The defendant finally told her they were drugs she had gotten from someone at Ridgeway High School. Hunt asked the defendant about the bandage on her hand, and the defendant told her she had cut it on a beer bottle at the Italian Festival on Saturday night.

Hunt said that when she asked the defendant about her activities on Saturday, the defendant told her

> that she was at home and she was going out that night and then she said she snuck out. She gave me two different stories. . . . That she had snuck out and then the other conversation was that she had ridden by the house and decided

-25-

not to go home because she had talked to her mom and she was already going to bed.

Hunt said that the defendant "got very defensive when [Hunt] corrected her that her story was different." She asked the defendant what time she had gotten home, and the defendant said she did not know.

Hunt said the defendant received a phone call from the police department, after which she asked Hunt if she was a suspect. The defendant told Hunt, "I hug my mother, I touch my mother. I'm all over my mother." Hunt told the defendant not to worry because the police would find out who killed her mother, and the defendant "very cold[ly]" replied that the police did not find out who had killed her father. The defendant then told Hunt that she wanted to go tanning or shopping, but Hunt refused to take her. The defendant called Kathy Menkel, Anna Menkel's mother, who came and picked her up. Hunt later picked up the defendant from Menkel's house and took her to the hotel where the victim's sisters were staying. En route to the hotel, Hunt again asked the defendant about the cut on her hand. The defendant told her that she had cut her hand while trying to get her cat out of the garage. When Hunt told the defendant that was a different story from what she had told her previously, the defendant "got defensive . . . and started saying that she wanted to kill herself." Hunt subsequently visited the defendant at the hospital, and the defendant wanted her to contact Perry Brasfield, but she refused to do so. The defendant told Hunt that she had talked to her aunts about getting an apartment, but the "big issue was always money. That what [the defendant] wanted and what [the defendant's aunts] were willing to give her as far as money was not up to [the defendant's] standards." The defendant told Hunt on multiple occasions that her aunts were "keeping her money from her. That the cars were hers, the money was hers."

Rebecca Robertson testified that she was a friend of the victim's brother, Eric Sherwood, and that they worked at the same apartment complex. She said that she met the defendant for the first time on the day of the victim's funeral. The defendant stayed with Robertson and her daughter for about six weeks after the victim's death, and Robertson noticed a cut on the defendant's hand. When she asked the defendant about it, the defendant told her she had cut her hand at the Italian Festival and "wouldn't say anything else about it." Robertson recalled a day toward the end of June 2005 when the defendant was visiting with her in her office and the police arrived in response to a problem with one of the residents at the apartment complex. Upon seeing the police, the defendant asked Robertson, "[A]re they here for me?" Robertson thought the defendant's question was "kind of unnerving a little bit the way that she spoke. And she seemed really nervous. Very uncomfortable." The defendant's family subsequently rented an apartment for her at Robertson's apartment complex, but, after about a month, the defendant was evicted because of "[n]oise complaints" and having a pet on the property.

-26-

Mark Irvin, a pastor with the United Methodist Church, testified that he dated the victim from July 2001 until about a month before her death. During the course of their relationship, there were times when they had differences of opinion "maybe an average of about every five months, somebody would say something that would hurt the other person's feelings, . . . [b]ut there was never any kind of violence. And [they] would take a time apart. [They] would think about it. And [they] would reconnect." He visited the victim in her home "a lot" and sometimes spent the night. He acknowledged that he had a key to her house and still had it at the time of her death. He said it was not unusual for the victim to sleep in the nude in the summer months. He and the victim often golfed together, and he identified his pitching wedge which had been missing for two or three months prior to the victim's death. He explained that his club had accidentally been put in the victim's golf bag.

Irvin said that he moved from Memphis in 2004 and was living in Jackson in 2005. He said that, about a month before the victim's death, he took her to a Memphis restaurant where they discussed their relationship. The victim came to Jackson a day or two later to again discuss their relationship and that was the last time Irvin saw her. He said that the victim called him on June 4, 2005, wanting to take him out to dinner for his birthday in Jackson the next day. However, he was not ready to reconcile with the victim, so she was not going to come to Jackson. Irvin said that his conversation with the victim ended on friendly terms other than she was disappointed. He called the victim's cell phone later that night between 11:30 p.m. and midnight but realized it was too late to call and hung up. He learned of the victim's murder the next day and came to Memphis late that afternoon.

On cross-examination, Irvin denied that he and the victim ever had any violent arguments. He acknowledged that he and the victim occasionally had sex at her home but said that the defendant was "very seldom" present on those occasions.

Keith McDonald testified that he worked as a sales clerk at the Walgreens on the corner of Poplar Avenue and Massey Road on June 5, 2005. He identified photographs, including one of himself, taken from the store's security camera that morning. He recalled that the female customer shown in the video at about 4:00 a.m. checked out at his register and that she purchased medical supplies, including bandage tape, hydrogen peroxide, and Liquid Skin. The customer asked McDonald for a paper towel, and he gave her one.

Deborah Walls, an assistant manager at the Walgreens located at Poplar Avenue and Massey Road, testified that she was contacted by Sergeant Merritt to see if she could retrieve a receipt for some products purchased between 12:00 a.m. and 5:00 a.m. on June 5, 2005. Because the store had an electronic journal, Walls was able to search the items Sergeant Merritt brought to her by entering the UPC code which would then bring up a receipt if the items were purchased at that store. She retrieved the receipt which indicated that all of the items were purchased at the same time, at the same register, and in the same transaction at

the store. She identified a photograph of the items and the store receipt reflecting the total price of the transaction as $22.55. The transaction was paid with $40 cash. She then viewed the security videotape for that time period and gave the tape and receipt to Sergeant Merritt.

Louie Nelson, Jr., the director of safety and security for MIC Burger King, testified that he was also the security manager for four All-In-One convenience stores in Memphis and that he was contacted by the Memphis Police Department regarding security video from the All-In-One store located at 6646 Poplar Avenue. The video reflected that the defendant purchased gas at the store on the morning of June 5, 2005. According to the receipt for the transaction, the gas was purchased at 4:20 a.m.

The defendant elected not to testify and rested her case without presenting any proof.

## ANALYSIS

On appeal, the defendant raises twelve issues, several of which we have consolidated because of their similarity.

### I. Representation by Counsel/Search and Seizure Issues

### A. Testimony of Genevieve Dix

The defendant argues that the conversation at the crime scene between her and Ms. Dix, who is an attorney, was protected by the attorney-client privilege and that the trial court erred in allowing Ms. Dix to tell the jury of her profession. The State responds that the trial court correctly determined that Ms. Dix was not acting as the defendant's attorney and, thus, their conversation was not privileged.

Previously, we have set out in detail the trial testimony of Ms. Dix. Regarding this issue, the trial court provided a lengthy analysis, which we will set out in part, as to why the attorney-client privilege did not apply to the conversation between Ms. Dix and the defendant:

> We have two conflicting stories here. We have [the defendant] saying that she walked over to her and said I want to talk to you as my attorney.
>
> M[s.] Dix denies this. She says that when she made the scene, the police, before she could talk to [the defendant], . . . several police talked to her, why are you here, and in what capacity.
>
> She denied being her attorney from the start. That when [the defendant]

-28-

started to talk to her, she told her immediately that I'm not your attorney.

When she showed her the form, she said, . . . I'm not your attorney, I'm not a criminal lawyer. I don't know anything about that form, and I'm not acting as your lawyer.

And I find that [the defendant's] credibility is lacking in this instance. And that [the defendant] went to [Ms. Dix] and talked to her as a friend, but did not tell her that she was talking to her as her attorney.

. . . .

And I find as a matter of fact that [the defendant] was told by [Ms. Dix] before she made these statements, I'm not acting as your lawyer.

Therefore, any confidence that [the defendant] had in M[s.] Dix's not communicating her oral statements to M[s.] Dix, [sic] would be confidences as a family friend, not as a lawyer.

. . . .

But I find that M[s.] Dix in giving this testimony will not be disclosing a communication made to her as [an] attorney, as such, during the pendency of the suit, before or afterwards, in this case, the homicide case.

So, for that reason, I'm going to allow her to testify. I find that this was not a privileged communication, because before [the defendant] made these statements, she was informed by M[s.] Dix, just as M[s.] Dix had informed everybody else on the scene before talking to [the defendant] that she was not there as an attorney. And that [the defendant] knew that when she discussed it with her.

As to this finding, the defendant argues on appeal that the trial court erred in concluding that the communications she had with Ms. Dix were personal rather than professional. The defendant sets out as "undisputed facts" the defendant's asking to "speak to the sole lawyer present asking only legal questions pertaining to her rights and the legal form provided by police." Further, argues the defendant, "[h]er questions clearly reveal she sought legal advice, confided in Dix to do so, and was never advised by Dix that these communications were not protected by confidentiality." To these arguments, the State responds that Ms. Dix informed both the defendant, as well as officers at the crime scene, that she did not represent the defendant, and, thus, the court correctly determined that she

could testify as to the defendant's statements to her.

Tennessee Code Annotated section 23-3-105 codifies the attorney-client privilege:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury.

In making its determination that the defendant and Ms. Dix did not have an attorney-client relationship, the trial court found that there were "two conflicting stories" and credited the testimony of Ms. Dix. To assess this ruling, we will review the relevant testimony.

During a jury-out hearing, the defendant testified that she asked Ms. Dix "if [she] should sign" the forms and was told that if she "had nothing to hide, then sign it." The defendant explained why she wanted to talk with Ms. Dix about the consent forms: "I picked her because . . . she was an attorney. I knew she was an attorney and I kind of – you know, I knew that she wouldn't tell me to sign something if I shouldn't sign it. You know, I trusted her. So, that's why I picked her." On cross-examination, the defendant denied that Ms. Dix told her that she was not acting as her attorney.

Ms. Dix testified that she came to the scene that morning after receiving information that the victim had been killed. She told a police officer dressed in a suit that she had come because she was a friend of the victim and not in capacity as a lawyer. She said that she made this "clear to the officer and [she] made it clear about fifteen other times that day whenever anybody would ask [her] anything, including [the defendant]." Ms. Dix explained in detail her initial conversations in this regard with the defendant:

> Well, when that question came up, when the officer came over and said, who are you? And I told him. Then he took me over to where she was and he had handed her the consent form. And he said, she wants to talk to you about this. I said, I don't represent her. I'm not a criminal attorney. What is that? And he said, that's a consent to search. I said, I've never even seen one. I don't do criminal law. He said, well, she wants to talk to you. And so, I walked with [the defendant] over to the driveway area and I said . . . I can't represent you. I'm not a criminal attorney. I've never seen one of these consent forms in my life. She said, what does it mean? I said, I cannot tell you . . . . I said, you can read it. I can read it. And she said, well, you know, what can they do? I said, . . . they want to search the house. I said, but you know, I can't tell you anything beyond that. I mean, clear, [sic] your mother

is lying dead in there not forty feet from where we are, and don't you want to help them?  And she said, well, can they get in my car?  And I said, . . . I can't tell you that.  I don't know whether they can or not.  I've already told you, I don't represent you.  I haven't got any idea what this form means.  I don't know whether it extends to the grounds or the cars or whatever.  I said, I don't know any of that.  And she just kept saying, can they get in my car[?]  And I kept saying, . . . I don't know.  And I said, . . . what in the world's in your car that you're so worried about it and your mother's lying dead in there and they need to investigate?

Ms. Dix testified that she never told the defendant she was acting as her attorney and that after the defendant signed a consent form, which an officer then handed to her, she told him that she was "not going to sign it.  I'm not her attorney.  I don't represent her." However, Ms. Dix did agree to sign the form as a witness.

In resolving conflicts between the testimony of Ms. Dix and the defendant, the trial court accredited that of Ms. Dix.  The court concluded, as a matter of fact, "that [the defendant] was told by [Ms. Dix] before she made these statements, I'm not acting as your lawyer."

In her reply brief, the defendant argues that "the attorney-client privilege may attach even when legal representation is declined by the attorney, such that no attorney-client relationship is formed."  In support of this argument, the defense relies upon <u>Grace v. Center for Auto Safety</u>, 72 F.3d 1236, 1242 (6th Cir. 1996), for the statement that, as to whether an attorney-client relationship exists, "the focus is on the client's subjective belief that he is consulting a lawyer in the lawyer's professional capacity and his intent is to seek professional legal advice."  However, in that case, there had been a lengthy course of dealing between the party and the lawyer, during which the party had been "regularly seeking and obtaining professional legal advice."  <u>Id.</u>  In the present appeal, however, the only dealings between the defendant and Ms. Dix were at the crime scene.  According to the testimony of Ms. Dix, she made it plain to the defendant that she had no experience in criminal law, had never before seen consent to search forms, and was there as a friend of the victim and not a lawyer for the defendant.  The court accredited the testimony of Ms. Dix as to her advising the defendant that she was not acting as her counsel, and the record supports this determination.

The defendant also argues that the trial court erred in allowing Ms. Dix to testify that she was an attorney, asserting that this information enhanced her credibility with the jury. It is not unusual for a witness to be asked about his or her employment or professional status. In all such cases, it is up to the jury to determine whether that status bears on the credibility of the witness.  It is, therefore, relevant evidence.  Thus, we agree with the trial court's ruling that the information as to her profession was admissible to place her testimony into the

proper context.

## B. Motions to Suppress/Search and Seizure

The defendant filed motions to suppress evidence obtained as the result of searches of the defendant's residence on June 5, 2005, and her vehicle on June 19, 2005, arguing that her signing the "consent to the search was predicated upon her having advice of 'her attorney.'" Since the trial court concluded that Ms. Dix and the defendant did not have an attorney-client relationship, the defendant's consent to the search was not voluntary, according to her argument. The State responds that the defendant gave valid consent to both searches and, additionally, that she did not establish she had standing to object to the search of the vehicle.

In reviewing a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

### 1. June 5, 2005 Search of the Defendant's Residence

As we have set out, Sergeant Merritt, after first viewing the victim's body inside the residence, advised the defendant that he either needed her consent or a search warrant to search the residence. The defendant was then presented with a consent to search form and asked that Sergeant Merritt inform Ms. Dix that the defendant wished to speak with her. When he did as the defendant requested, Ms. Dix responded, "I am an attorney. However, I am not here in that capacity. [The victim] is my best friend and I am here because of that." The two then returned to the defendant, and Ms. Dix stated, "I don't represent her. I'm not a criminal attorney." The defendant and Ms. Dix walked a few feet away, and Ms. Dix advised the defendant, "I can't represent you. I'm not a criminal attorney. I've never seen one of these consent forms in my life." Ms. Dix was asked by the defendant if the police could search her car and replied, "I've already told you, I don't represent you. I haven't got any idea what this form means. I don't know whether it extends to the grounds or the cars or whatever. . . . I don't know any of that." The defendant said that she was going to sign the form, and she and Ms. Dix then returned to Sergeant Merritt. The defendant signed the form, which Sergeant Merritt handed to Ms. Dix for her signature. However, Ms. Dix said,

in the presence of the defendant, "I'm not her attorney. I don't represent her."

The consent to search form signed by the defendant reads as follows:

> I, Nora [sic] Jackson, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Sgt. W.D. Merritt and Sgt. T. Helldorfer[,] police officers Mphs Police Dept.[,] to conduct a complete search of my premises located at 5001 New Haven.

> This written permission is being given by me to the above named persons voluntarily and without threats or promises of any kind.

Noura Jackson  06/05/05
(Signed)    7:51 a.m.

WITNESSES:
Genevieve M. Dix
Sgt. W.D. Merritt
[Illegible signature of third witness]

The trial court determined that the defendant had consented to the search of her mother's residence:

> I understand there was some issue about Ms. Di[x] being present or not present, but I've got no proof before me that this was anything other than a voluntary consent to search with a [d]efendant who is an adult, who was not under any mental impairment or intoxication that I can see, so I find that the consent to search is valid and was freely given, and so I'm not going to suppress any of the items seized under that consent to search.

On appeal, the defendant makes several claims as to these findings. She argues that the court erroneously concluded that the relationship between her and Ms. Dix was "personal," rather than "professional," and in finding, subsequently, that "all communications were subject to disclosure." Additionally, the defendant argues that, in relating her conversation with the defendant, Ms. Dix "made negative inferences to the jury directly referring to [d]efendant's effort to seek legal advice before executing a police consent form [which] subverted [d]efendant's presumption of innocence and adversely reflected on her for exercising her constitutional right to legal counsel."

Previously, we have reviewed and agreed with the trial court's ruling that Ms. Dix was

not functioning as an attorney in her conversations with the defendant. While the defendant argues on appeal that she would not have signed the consent to search unless she believed that Ms. Dix was functioning as her attorney, the trial court accredited the contrary testimony of Ms. Dix. As we have set out, the court found that, when the defendant signed the consent to search the residence, she was not under any mental impairment or intoxication and her consent was freely given. We conclude that the record supports these determinations by the trial court.

### 2. June 19, 2005 Search of the Defendant's Vehicle

The defendant also filed a motion to suppress evidence obtained as the result of a June 19, 2005 search of a Jeep Grand Cherokee, which was parked in the driveway of the victim's home. She asserts that the information which was the basis for the affidavit supporting the warrant resulted from an illegal view of the vehicle obtained by Sergeant Helldorfer. As to this claim, the State responds that the defendant failed to prove she had a possessory interest in the vehicle and, as a result, did not have standing to challenge the search and failed to show any infirmities in the search warrant. We will review these claims.

The consent to search form for the vehicle, signed by the defendant and bearing the date and time of June 5, 2005, at 10:50 a.m., provided as follows:

> I, Nora [sic] Jackson, having been informed of my constitutional right not to have a search made of the vehicle hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize investigators of Homicide – MPD to conduct a complete search of my vehicle, a 1997-98 Jeep Cherokee – silver, tag TN DU9486, VIN _____ located at 5001 New Haven.
>
> This written permission is being given by me to the above named persons voluntarily and without threats or promises of any kind.
>
> WITNESSES:
>
> Sgt. C.V. Justice

Subsequently, on June 17, 2005, Sergeant Merritt obtained a search warrant for "a 1998 gray 4-door Jeep Grand Cherokee bearing Tennessee tag number DU9486 and VIN 1J4FX58SXWC110113, registered to Jennifer Jackson, at 5001 New Haven in Memphis, TN."

Overruling the motion to suppress, the trial court concluded that the defendant did not

have standing to contest the search of the vehicle:

> I've got no proof before me that it was titled to [the defendant] or that she at all had a possessory interest in this automobile. I have no proof before me that [the defendant] owned the home at 5001, whatever the address is, that it was her property. So [the defendant] does not have standing to contest an officer walking up the driveway of a woman's property who has been murdered when the police look in the car through the window. She also has no standing . . . to contest any property seized from that vehicle because I that no proof that she the vehicle at all [sic].

Accordingly, the trial court found that the search warrant for the vehicle was valid, properly executed, and, additionally, that the defendant did not have standing to object to the search.

One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place or thing to be searched. State v. Oody, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991). One who does not have such an expectation of privacy lacks "standing" to challenge the search. State v. Patterson, 966 S.W.2d 435, 441 n.5 (Tenn. Crim. App. 1997).

The testimony was that the vehicle was registered to the victim and parked in the driveway of the residence owned by the victim. We note that on appeal the defendant has not contested the trial court's finding that she did not establish that she had standing to object to the search of the vehicle registered to the victim. Accordingly, we conclude that the evidence supports the determination by the trial court that the defendant did not establish that she had standing to object to the search of the vehicle.

## II. Evidence of Motive

Several of the defendant's issues on appeal are based upon the trial court's rulings that certain evidence was admissible to establish the defendant's motive to kill the victim.

### A. Testimony Regarding the Defendant's Use of "Drugs"

The defendant asserts that the trial court erred in allowing lay witnesses to testify as to "drugs" in her possession. The State responds that the trial court correctly allowed this testimony, based upon the witnesses' personal knowledge, admissions by the defendant or statements overheard by the witnesses, because it was relevant to establish a motive for the killing of the victim. In her reply brief, the defendant refines her argument, asserting that, as to this testimony, the court erred in allowing lay witnesses' "identifying narcotics and

attributing their use, possession and delivery to [d]efendant absent proper factual foundations as predicates or pharmacological expertise."

We previously have set out in detail the testimony of the witnesses at trial and will summarize briefly their testimony regarding the defendant's use of drugs.

Sophie Cooley testified that she had seen the defendant use marijuana, cocaine, and Lortab. Eric Sherwood testified that the defendant told him she had smoked marijuana before and after the victim's death. Koale Madison testified that he had seen the defendant use cocaine, Xanax, and Lortab and had used mushrooms and marijuana with her. Kirby McDonald testified that she had often smoked marijuana with the defendant. Joey McGoff testified that he had seen the defendant use marijuana, cocaine, alcohol, and Lortab. Perry Brasfield testified that he and the defendant had used alcohol, marijuana, Lortab, Xanax, and cocaine together. Regina Hunt testified that she found pills and a prescription bottle in the defendant's purse, and a pharmacist told her that the bottle contained Hydrocodone. The defendant later admitted that the drugs were hers. Alexandra Kline testified that she saw the defendant consume alcohol on more than one occasion.

On appeal, the defendant presents several arguments as to why the court erred in allowing this testimony. According to the defendant, the State's "original theory of [d]efendant's motive for matricide was profit." After proof that the defendant's deceased father died without assets, the State claimed that the motive was "drugs," according to the defendant, and that the trial court correctly determined that "each of the witnesses about which the defendant complains personally observed and used those drugs with the defendant, the defendant admitted to them what she was taking or that she was being tested, and/or they were present when the defendant and the victim discussed these matters." The State notes that the trial court conducted Tennessee Rule of Evidence 404(b) hearings as to the State's witnesses Cindy Eidson, Sophie Cooley, Eric Sherwood, McKenzie Koale Madison, Carter Kobeck, Kirby McDonald, Joey McGoff, Perry Brasfield, Regina Hunt, and Alexandra Kline. We will review the court's rulings as to these witnesses.

Following a lengthy jury-out hearing regarding the difficult relationship between the defendant and her mother, the trial court concluded that testimony regarding it would be allowed because it was probative to "the motive that [the defendant] had and her state of mind as far as premeditation and a reason to kill." The court explained that the jury would hear proof that the defendant was "having these parties at home against her mother's wishes" and of the fear of the defendant's being expelled from school, not to show that the defendant acted in conformity with a certain trait but because they were "probative to a reason that [the defendant] would resent her mother" and the testimony was not unfairly prejudicial.

When the jurors returned to the courtroom, the trial court instructed at length as to how they were to consider the testimony of Cindy Eidson, as well as that of the defendant's friends, regarding the relationship between the defendant and the victim, explaining that "[t]he only thing you can use this for is to show the relationship between [the defendant] and her mother and any possible motive or lack of motive for a killing."

In each jury-out hearing prior to the testimony of each witness as to the defendant's use of drugs and alcohol, the court concluded that the witness's testimony about the defendant's drug and alcohol use was relevant to help the State prove its theory as to her motive for the killing. The court further concluded that the defendant's drug and alcohol use was dissimilar to the crime for which she was on trial and the probative value of such evidence was not outweighed by its prejudicial effect. The trial court's ruling with respect to Sophie Cooley's proposed testimony best explains its analysis and handling of this issue:

> I think this [is] relevant to show why her mother was concerned about her and wanted to send her to boarding school and do all these other things, and it would be a motive for her mother to be wanting to clamp down on her and that would be a motive for her to put her mother away.
>
> . . . .
>
> I'm finding it's not a similar crime as murder, and I'm finding that given the probative value of [the defendant's] running with these other kids who were all doing drugs, that that's probative to show the trap, and I'm looking at the evidence from the State's point of view, to show the trap that [the defendant] was in, and the only way she could avoid that trap was to put her last parent away and inherit that money. That's the State's theory.
>
> And I find that this drug use is very relevant to that theory, and for that reason, I find that any unfair prejudice, especially with my curative instruction to the jury, any unfair prejudice does not outweigh the probative value.

Then, before Cooley testified as to the defendant's use of illegal drugs, the court gave a curative instruction to the jury regarding her testimony:

> And you are going to hear a witness'[s] testimony, and I want to give you another curative instruction. This witness may testify to use of drugs by the defendant, legal or illegal drugs.
>
> If you do hear testimony, and you choose to believe that testimony, which is up to you, this cannot be used by you to say, well, because she used

an illegal drug or a legal drug, therefore, she's guilty of the offense now on trial.

If an illegal drug was used by anyone or if someone drank alcohol under age, that would be a criminal act. But . . . you cannot use that to show that because someone did that, that they would also commit the crime that's charged.

I will give you a jury instruction at the end of the trial, and it's basically going to say, if from the proof you find that the defendant has committed a crime or crimes other than that for which she is on trial [sic]. You may not consider such evidence to prove her disposition to commit such a crime as that on trial, just from committing that other crime. And we will set out reasons, and the reason is offering this proof, and that will be the only thing you can consider it for. Does everybody understand that? We will be revisiting this issue later.

As we have set out, Sophie Cooley then testified, in part, that she had attended parties with the defendant when they were teenagers, where they drank alcohol and used drugs, that she had frequently smoked marijuana with the defendant at her house, had seen the defendant snort cocaine, and that she saw the defendant take three Lortabs on the evening before the homicide.

Likewise, prior to the testimony of Eric Sherwood, the court had a jury-out hearing and concluded that his testimony as to the defendant's use of illegal drugs was "clear and convincing. And . . . the probative value of this to show the motive and the reason for the killing is not . . . outweighed by the danger of unfair prejudice to [the defendant]."

As to the defendant's use of drugs, Sherwood testified that a few months before the victim's murder, the defendant admitted to him that she had smoked marijuana. Also, on May 21, 2005, during a birthday party for him at the victim's house, the defendant arrived late and the victim said her eyes looked "glazed over" and she looked "high." However, the defendant denied that she was on drugs.

The trial court conducted a jury-out hearing prior to the testimony of McKenzie Koale Madison and concluded that his testimony regarding the defendant's drug use was admissible: "It would be two years prior to her death. We've already had testimony from Miss Cooley that she was there at the cocaine incident. And I think their relationship during this two years is relevant. So I'm going to allow that."

Madison testified, in part, that he had seen the defendant use marijuana, mushrooms,

-38-

and cocaine and had "[q]uite often smoked marijuana with the defendant in the year before the victim's death.

Prior to the trial testimony of Kirby McDonald, she testified out of the presence of the jury as to her smoking marijuana with the defendant, and the court determined that this evidence was "clear and convincing" and admissible. McDonald then testified, in part, that she and the defendant often smoked marijuana and that on June 4, 2005, McDonald took a fourth of a Xanax bar.

Prior to his trial testimony, Joey McGoff testified out of the presence of the jury that he once, "probably close to a year" before the victim was killed, had seen the defendant use cocaine, and "a lot of times" had seen her smoke marijuana, as well as seen her drinking beer, whiskey, or vodka and taking Lortabs. Following a defense objection that this testimony would be cumulative and prejudicial, and the State's response that the testimony was permissible because McGoff was talking of different occasions than had the other witnesses, the court ruled that the testimony would be allowed: "I think that's going to be a jury question. So as far as being cumulative, any unfair prejudice, . . . we wouldn't be adding any unfair prejudice at all to it, either, so I'm going to allow the State to make their case, and of course, you can cross examine him."

McGoff then testified to the jury in part that he had seen the defendant use Lortab and alcohol and, once, cocaine, and had both seen the defendant smoke marijuana and smoked it with her on multiple occasions. After the victim's death, he smoked marijuana and consumed alcohol with the defendant at her apartment.

Perry Brasfield testified at a jury-out hearing that he had seen the defendant use cocaine, marijuana, Lortab, Xanax, and alcohol. As to the testimony of this witness, the defense renewed the same objection, and, in accord with earlier rulings, the court allowed the testimony. Brasfield then testified as to these facts, saying that he had "snorted" cocaine with the defendant.

Regina Hunt testified out of the presence of the jury that she had found pills in the defendant's purse and "confronted her about them." The trial court ruled that this information was relevant:

> Now, as far as the relevance, I've already found that these things are relevant beforehand, showing the relationship with the mother, . . . a defendant's actions after a killing may be taken into consideration of the jury to show premeditation and other things.
>
> . . . .

-39-

But I find that it's relevant. I don't know how the jury's going to take it. But I still find that this 404(b) evidence is probative of this mindset of the defendant, and I don't find that any unfair prejudice outweighs the probative value, under 404(b). So, I'm going to allow that.

While Alexandra Kline testified as to the defendant's use of drugs, the record on appeal does not include a transcript of the jury-out hearing.

At the conclusion of the trial, the court again instructed the jury as to how it was to consider evidence as to the defendant's use of drugs and alcohol:

Evidence of alleged alcohol or drug use. If from the proof you find that the defendant has engaged in alcohol or drug use, you shall not consider such evidence to prove her disposition to commit such a crime as that on trial.

This evidence shall only be considered by you for the limited purpose of determining whether it provides motive.

That is, such evidence shall be considered by you . . . if it tends to show a motive of the defendant for the commission of the offense presently charged.

Such evidence, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

We will review the defendant's claims that the trial court erred in allowing this testimony as to the defendant's drug and alcohol use.

Tennessee Rule of Evidence 404(b) sets out the procedure by which proof of other crimes may be admitted:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the

evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

On appeal, the defendant's specific argument is that the trial court erred, as to the Rule 404(b) findings, by not requiring an adequate foundation as to whether the substances in question were actually drugs or requiring proof as to the ability of each of the witnesses accurately to identify what they testified to were drugs. Further, according to the defendant's argument, the trial court's allowing this testimony was contrary to the provisions of Tennessee Rule of Evidence 701(a)(1), which requires that, when a lay witness is providing opinion evidence, the testimony "is limited to those opinions or inferences which are rationally based on the perception of the witness." In support of this contention, the defendant identifies perceived deficiencies in the testimony of the various witnesses regarding their description of the defendant's drug use.

The State responds that, prior to allowing testimony regarding the defendant's use of drugs, the court conducted jury-out hearings of the witnesses in which the witnesses testified that they observed and used drugs with the defendant, she told them what drug she was using, and/or they were present when the victim and the defendant discussed her usage of drugs.

Generally, Rule 404(b) is one of exclusion, and evidence is not admissible that an accused has committed some other crime or bad act independent of that for which he or she is charged, even though it may be a crime or act of the same character as that for which the accused is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime or bad act separate from the one for which he or she is being tried is relevant to some matter actually in issue in the case on trial and its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. See id. "Only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). We review a trial court's ruling on evidentiary matters under Rule 404(b) under an abuse of discretion standard, provided the trial court has substantially complied with the prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

On appeal, the defendant relies upon the holding of our supreme court in State v. Marise, 197 S.W.3d 762, 766 (Tenn. 2006), in which the court concluded that olfactory

observations of the officers may not be enough, standing alone, to convict. In that case, however, the court was dealing with a statute which criminalized the possession of anhydrous ammonia consisting of at least 82 % nitrogen.

As the State notes on appeal, its trial theory was the defendant killed the victim because she had told the defendant of her being tested for drugs and sent to a boarding school. Following the Rule 404(b) hearings conducted by the trial court prior to testimony regarding the defendant's use of drugs, the court made extensive findings that the testimony was probative and relevant to show why the victim wanted to test the defendant for drugs and send her to a boarding school and that the probative value of this evidence outweighed its prejudicial effect. Additionally, we note that the trial court gave limiting instructions as to how the jury was to consider this testimony. Accordingly, we conclude that the record supports the determinations by the trial court that this testimony was probative in establishing the defendant's motive for the crime.

## B. Evidence as to Defendant's "Other Crimes and Bad Acts"

The defendant argues that the trial court erred in allowing testimony as to her having sexual relations with Perry Brasfield at a time after the murder; as to her eviction from an apartment; as to her educational performance and health history; and as to her hospitalization at Lakeside Hospital. We will consider these claims.

During the direct examination of Perry Brasfield, he was asked about the defendant's coming to his house at a time following the death of the victim, and he responded, without objection, that it had been "[a] while after[wards]" that she had called him, come to his house and climbed a ladder to his bedroom, where they had sexual intercourse. Since no objection was made to this series of questions and answers at trial, the objection to them on appeal is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Rebecca Robertson, the assistant manager at the apartment complex where the defendant resided before she was arrested after the victim's death, testified that the defendant was evicted from the apartment for "not following the lease agreement. Disturbances. And having a pet that wasn't supposed to be there." The disturbances consisted of "[n]oise complaints." After "two and possibly three" conversations about this with the defendant, Robertson evicted her. The defendant objected to the testimony regarding the eviction, asserting that it was "irrelevant and violative of 404(b)," and the court overruled this objection. Ultimately, the court concluded that the witness would be allowed to testify that the defendant was threatened with evictions because of parties in her apartment. Robertson then testified of noise complaints because of parties in the defendant's apartment, about

which she had "two and possibly three" conversations with the defendant, after which she was asked to move out because the behavior continued.

The record supports the trial court's determination that this testimony was admissible to show the behavior of the defendant following the victim's death.

After the defendant's aunt, Cindy Eidson, had been the subject of direct and cross-examination out of the presence of the jury, the trial court explained that she would be permitted to testify as to the bases for the disputes between the defendant and the victim because her testimony was relevant to show the relationship between the two and the defendant's state of mind, and the probative value of the evidence was not outweighed by its prejudicial effect. Once again the trial court issued a lengthy curative instruction to the jury regarding the limited purpose of the evidence.

The record supports the trial court's determination that this testimony was relevant to show the relationship between the victim and the defendant.

Cindy Eidson and Grace France then testified that the defendant was hospitalized by the time of the victim's funeral and remained there for approximately one month. Eric Sherwood testified that the defendant had attended several different schools, St. Mary's, St. Agnes, Ridgeway, St. Georges and, then, was home-schooled. The defendant argued, before Sherwood's testimony, that this information was irrelevant, but the court found otherwise, and Sherwood repeated the testimony before the jury. Additionally, during his lengthy testimony, Sherwood, in response to the State's question as to when he first saw the wound on the defendant's hand, responded, "God, I noticed it when we looked at Lakeside, I saw it."

The defendant objected to Regina Hunt's testimony that the defendant had said she wanted to kill herself, arguing that this was irrelevant and that she may have wanted to do so because she was "distraught" over her mother's death. The court concluded that the evidence was relevant because it showed the defendant's mental state.

We review a trial court's ruling on evidentiary matters under Rule 404(b) under an abuse of discretion standard, provided the trial court has substantially complied with the prerequisites of the rule. DuBose, 953 S.W.2d at 652.

In this matter, the trial court complied with the Rule 404(b) requirements by determining, before each of these witnesses had testified, the substance of their testimony and the basis of their knowledge. The court found that the testimony which the witnesses gave in this regard was admissible to show the defendant's mental state. We have carefully reviewed all of this testimony, the contending arguments of counsel, and the analyses of the

trial court and conclude that the court did not abuse its discretion in allowing this testimony.

### C. Hearsay Testimony of Witnesses Eidson, France, and Sherwood

The defendant argues that the trial court erred in allowing testimony by witnesses Cindy Eidson, Grace France, and Eric Sherwood as to hearsay statements of the victim, offered for substantive truth. The specific claim, cited by the defendant as to this issue, is that, Eric Sherwood, the victim's brother, testified that while he was riding in a vehicle with the defendant and the victim en route to Florida, the victim told the defendant that "drugs were found in [the defendant's system]" by "a drug test." The defendant "denied the fact that she did any kind of drugs," and the victim responded that they would "deal with it later when [they] g[o]t back to Memphis." Immediately following this testimony, the trial court, once again, issued a curative instruction to the jury regarding its limited use of the testimony. The trial court also explained in a jury-out hearing that it was allowing Sherwood's testimony because it concluded that the evidence was relevant to show the defendant's intent and possible motive and that the probative value of the testimony was not outweighed by its prejudicial effect. The trial court further concluded that the evidence fell within the state of mind exception to the rule against hearsay.

On appeal, the defendant argues that either the information as to the defendant's having drugs in her system "was intended to be accepted by the jury as truthful," or "so prejudicial it should not have been admitted to infer the state of mind or motive of [the] [d]efendant." Additionally, the defendant seeks to make a distinction that, since the statement as to drugs was made by the victim rather than the defendant, "it did not reflect [the] [d]efendant's thoughts or infer her state of mind."

We respectfully disagree with the defendant's analysis in this regard. First, the cases relied upon by the defendant for this argument do not support her position. In <u>United States v. Augenblick</u>, 393 U.S. 348, 353 (1969), the issue focused upon the government's non-production of interview notes and an audiotape made by government agents of an interview of the defendant. In <u>State v. Caughron</u>, 855 S.W.2d 526, 537 (Tenn. 1993), the relevant issues were whether the trial court erred in allowing testimony that a witness was "upset" with the victim because of a conversation between the victim and the defendant's mother and that the witness "hated [the victim] for going to [the witness's mother] and trying to separate [the witness] from the [d]efendant." Our supreme court agreed with the determination of the trial court that "any statements of the victim described by [the witness] were not offered for their truth but to show [the witness's] state of mind and what provoked her to harm the victim." <u>Id.</u>

In the present appeal, following the testimony of the victim's brother that the victim, in his presence, had told the defendant of drugs being found in the defendant's system, the

-44-

trial court immediately instructed the jury that this testimony was to be considered "to show the motive [the defendant] had for getting rid of her mother." These cases do not support the defendant's view that testimony admissible to show the defendant's state of mind or motive for the crime is limited to utterances of a third party and not the victim. Thus, we conclude that this issue is without merit.

### III. Photographs of Deceased Victim

The defendant argues that the trial court erred in allowing into evidence unduly gruesome and repetitive photographs of the victim. The State responds that the photographs were both relevant to explain the testimony of witnesses and that their evidentiary value outweighed any prejudicial effect. The State also responds that the crime scene photographs were relevant to the jury's understanding of the crime scene.

In State v. Trusty, 326 S.W.3d 582 (Tenn. Crim. App. 2010), this court explained the process by which a trial court must determine whether photographs are admissible:

> The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

Id. at 604.

Before any of the questioned photographs were accepted as evidence, the trial court described in detail what each depicted and explained why each was admissible. Although the photographs were graphic, that could be expected when a victim dies as a result of multiple knife wounds. We have examined the photographs and reviewed the trial court's determinations as to each and, as we will explain, cannot conclude that the court erred in allowing them into evidence.

## A. Exhibits 11 and 12

The trial court explained first what was shown in the photographs marked as exhibits 11 and 12 and why they would be admitted:

> It's a picture of the victim with her head up at the top of the picture with her knees at the bottom, and it shows a pool of blood under her left arm, and it shows a basket over her right shoulder, which presumably is the basket, if you will have her testify, that this was moved.
>
> I don't find that there's anything in this photograph that's unfairly prejudicial to the defendant, given the probative value that the State is going to have to show that there was blood to produce the fingerprints [sic].
>
> . . . [H]er eyes are open, but they're hard to see because they're at the top of the photograph.
>
> There are two tubes in the right and left shoulder, but they're distant and . . . you can't see that they're going into the body.
>
> The other photograph is a photograph of the bed with the body off to the right on the floor, in a distant picture, with items forty-five, forty-four and forty-three, little placards there.
>
> So, I'm going to allow in both of these photographs, and I find under [Tennessee Rule of Evidence] 403 that any unfair prejudice, and I really don't – although it's – there's some gore, there's a reason for it. And it's on the floor, it's not on the body, that any unfair prejudice, it does not substantially outweigh the probative value of this photograph.

Since this photograph showed the position of the victim's body when first found and is not unduly prejudicial, we concur with the determination of the trial court that its probative value was not substantially outweighed by any prejudicial effect. Thus, the record supports the trial court's determination on this matter.

## B. Exhibits 111-116

These exhibits consist of two photographs, from different perspectives, of the victim's body and four photographs, also from different perspectives, of the victim's bed and bedroom. Because of the large number of photographs, many of which were admitted in groups, but with individual exhibits numbers, it is not entirely clear that the defendant

-46-

objected to admission of these photographs. It appears they were among a group of photographs that the trial court determined were not prejudicial to the defendant. We have examined the photographs and conclude, as the trial court did, that the photographs accurately depicted the crime scene, that they served to explain the testimony of the State's witnesses, and that their probative value was not substantially outweighed by any prejudicial effect.

### C. Exhibits 264-266

These exhibits consist of photographs of the victim's left shoulder and upper arm, her feet and legs beneath the knees, and a pillow with several bloodstains. The trial court found that these photographs were not gruesome and that they were relevant because they offered different perspectives of the crime scene. The record supports this determination.

### D. Exhibits 269-271

These exhibits consist of photographs of the victim's feet and lower legs, the right side of the victim's body from her hip to her face, and a pillow and bed, both with bloodstains. As with earlier exhibits, the court found that these photographs were not gruesome and were relevant because they offered different perspectives of the crime scene. The record supports this determination.

### E. Exhibits 286-287

The trial court described Exhibit 286 as a photograph depicting the bed and the floor and Exhibit 287 as a photograph showing a stain on the floor. They were utilized during the testimony of Officer Patricia Turnmire to illustrate her testimony. The trial court found that these photographs were probative, were not gruesome, and admitted them into evidence. The record supports this determination.

### F. Exhibit 323

Dr. Chancellor, through whom this photograph came into evidence, testified that it showed the victim's "neck and . . . thorax, the chest and upper part of the abdomen, the front part of the body. And it shows the body as it appeared to me at the time of my examination." Dr. Chancellor continued her testimony saying that the area and wounds shown by the photograph corresponded with what was shown on the victim's body chart. The trial court found that this photograph was relevant and probative, which was not substantially outweighed by any prejudicial effect, and the record supports this determination.

## G. Exhibits 330-339

The court described this autopsy photograph:

I don't see that this is gruesome and there's no pooled blood. There's no tubes in the body and it accurately represents what the body looked like after it was cleaned up, so I'm going to allow this, but I'll mark it – well, we'll show – let me just describe it for the record.

It's a photograph from the middle of the face on down below the belly button of the torso, the front of the torso.

The court explained why the photograph was admissible:

Well, what we have here, and it's almost geographical, it has little layers of scratches, so I don't see that there's any unfair prejudice to it. And it does have a close-up showing scratches from a serration. So, I will allow that as well.

And for the record, it[']s got some stab wounds at the bottom. And at the top it's got some long scratches that look like geographic layers, almost.

All right. This one?

[THE STATE]: The same thing. Those marks are indicative of perhaps a serrated knife being used as well.

THE COURT: I don't see that this is prejudicial at all. Unfairly prejudicial at all. So, I will allow this. This is a close up of the serration scratches on the chin.

The record supports this determination.

## H. Exhibits 340-344

These photographs, taken during the autopsy with the victim's right arm covering about half of her face, show wounds to her upper left arm and numerous cuts to her neck and upper torso; wounds to her right forearm, right bicep, neck, and chest; several wounds to the interior of her right forearm; a wound to her forehead; and wounds to her right hand and wrist consistent with defensive wounds. As we understand, the defendant argued that these photographs were duplicative to photographs already in evidence. The trial court found,

however, that the photographs were not duplicative, and the record supports this determination.

Before these photographs were admitted into evidence, the trial court first examined each, explained why it was relevant to an issue in the case and concluded that its probative value was not substantially outweighed by the danger of its admission. We have examined each of these photographs and conclude that the trial court did not abuse its discretion in their admission.

## IV. Alleged Prosecutorial Misconduct

### A. References to Post-Arrest Silence of Defendant

The defendant argues that the State made improper references in its rebuttal argument at the close of the trial to her post-arrest silence, thus violating her Fifth Amendment rights and denying her a fair trial. The State responds that the trial court correctly concluded that the State had not commented upon the defendant's post-arrest silence in its use, in final argument, of the testimony of Cindy Eidson, the defendant's aunt.

The opening sentence of the State's rebuttal argument drew an objection from defense counsel and their request for a mistrial:

[THE STATE]: Just tell us where you were. That's all we're asking, Noura.[4]

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: All right. Would you all approach the bench[?]

> (Whereupon a bench conference was held on the record, in the
> presence of the jury, but out of its hearing, and the following
> proceedings were had, to wit:)

[DEFENSE COUNSEL]: I want a mistrial. That is absolutely inappropriate.

_____

[4]The record on appeal includes a DVD of what the defendant has represented shows the opening portion of the State's rebuttal argument at trial. However, Tennessee Supreme Court Rule 30(I) provides, in part, that film or videotape recorded by a media organization of a trial is not "admissible as evidence in the proceeding out of which it arose, any proceedings subsequent and collateral thereto, or upon any retrial or appeal of such proceeding." On August 31, 2011, relying upon that rule, this court denied the defendant's motion to play, at the oral arguments in this matter, this video recording. We have not considered the DVD in our review of this matter.

[THE STATE]:  It's a quote from an aunt who testified.

[DEFENSE COUNSEL]: There are enough Appellate Court opinions that [the prosecutor] ought to know that.

That is an unfair comment on my client's right to remain silent and it's a demand that she not remain silent.

She can couch it in whatever terms she wants, but that was grossly inappropriate.

THE COURT:  [The prosecutor]?

[THE PROSECUTOR]:  One of the witnesses testified to that, Your Honor, asking her where she was.  Just tell us where you were and we'll do anything we can for you.

THE COURT:  Okay.  I will give an instruction to the jury that she's commenting on testimony in the case and . . . I will also re-affirm, if you all wish me to, to the jury, that she does not have to testify today or any time during the trial in her own defense.

That she's talking about the question that she was asked –

[THE PROSECUTOR]:  By her aunt.

THE COURT:  – by the lay witness.

. . . .

THE COURT:  All right.

. . . .

[DEFENSE COUNSEL]:  We ask for a mistrial, immediately.

. . . .

THE COURT:  All right.  You all have made your record and what I'm going to do at some point is to give the jury an instruction at this time and I'll allow [the prosecutor] to proceed as long as you tie it to testimony in the trial.

[THE PROSECUTOR]: That's what I was attempting to do.

THE COURT: And not that you're speaking to the defendant now.

[THE PROSECUTOR]: No, sir.

[DEFENSE COUNSEL]: And in explaining that to the jury, Your Honor, I hope you will strongly explain to them that she doesn't have to tell anybody anything. That the burden's on the State to find out everything.

THE COURT: I understand.

Before the State continued its rebuttal argument, the trial court instructed the jury as to the defendant's right not to testify during the trial:

[L]adies and gentlemen, I want to make a distinction here so you'll understand.

I have given you in your jury instructions and you will get in your copy of the instructions, but to make sure that there's no confusion, the following instruction, which I will re-read to you, which you were discussed when we picked the jury last Monday.

Defendant not testifying. The defendant has not taken the stand to testify as a witness, but you shall place no significance on this fact.

The defendant is presumed innocent and the burden is on the State to prove her guilt beyond a reasonable doubt.

She is not required to take the stand in her own behalf and her election not to do so cannot be considered for any purpose against her, nor can any inference be drawn from such fact.

Now, when [the prosecutor] opened her argument, she was not at all discussing or asking [the defendant] a question. What she is doing, and she will explain to you, is that she was quoting another witness and commenting on the proof of the case that [the defendant], a witness who testified to something about [the defendant] being asked where she was.

It's very important for all of you to understand that you cannot ever, ever, hold anything against [the defendant] for not testifying in this trial.

-51-

Also, at any time from the time of this alleged killing until today, [the defendant] never has to talk to anyone about anything. She has an absolute right to remain silent and it's up to the State to prove her guilt beyond a reasonable doubt. It's not up to anyone to prove that they're innocent.

Can every one of you follow that instruction? And I want to see every head. Can you, sir?

(The jury was polled and each juror indicated an affirmative response.)

THE COURT: Okay. I'm going to allow [the prosecutor] to continue with this argument, but I want everybody to understand that when she says this phrase, she's not asking [the defendant] that question now about – commenting at all about her right not to testify.

She is talking about proof in the case.

Closing arguments as you have realized, are different than opening statements, in that attorneys can be persuasive. They can talk about the law and how it applies to the facts.

And they are allowed to draw reasonable inferences from the evidence. But the laws that we have that I've read to you and charged to you, you'll have back there, says that you can never, ever, hold it against anyone for not testifying on the stand in their trial because they have that right not to. They don't have to prove anything.

During this trial, the defense didn't have to ask any questions of jurors. Other than entering a plea to the indictment, they did not have to give an opening statement. They didn't have to ask any questions of any of the witnesses or give a closing argument. Because they have nothing to prove[.]

Does everybody understand that? The burden's on the State of Tennessee and never shifts.

Following the court's giving these instructions, the State's rebuttal argument continued with a reference to the question asked of the defendant by her aunt as to where she was at the time the victim was killed.

We will review the defendant's claims as to this statement in the State's rebuttal argument.

The trial testimony upon which the opening lines of the State's argument were based was that of Cindy Eidson, the defendant's aunt, who earlier had testified as to asking the defendant where she was during the time period in which the victim was killed.

On appeal, the defendant argues that the statement opening the closing argument, "Just tell us where you were," was an "impermissible comment on [d]efendant's election to exercise her Fifth Amendment rights and not testify at trial [and] was constitutional error warranting a mistrial." The State disputes this analysis, noting that, following the defendant's objection to the statement and the subsequent bench conference, the State explained that it was referring to the testimony of one of the defendant's aunts and that the trial court then instructed the jury that no inference could be drawn from the fact that the defendant had not testified and that the prosecutor's reference was to the evidence presented in the case.

In this matter, we must determine whether the allegedly improper remark by the prosecutor constitutes reversible error. In State v. Thornton, 10 S.W.3d 229, 234-35 (Tenn. Crim. App. 1999), this court discussed the limits upon a prosecutor's final argument:

> In general, closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Middlebrooks, 995 S.W.2d 550 (Tenn. 1999).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the

-53-

consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560. We will apply these considerations to the proof in this matter.

In the presentation of the State's case-in-chief, the defendant's aunt, Cindy Eidson, testified that she asked the defendant where she had been when the victim was killed, and the defendant said she had been "out with Chris all night." As we understand the conversation, the defendant also related that when Perry Brasfield called her that evening, she said she "was at home, outside smoking a cigarette" because "Perry hate[d] Chris." Eidson testified that, after the defendant's arrest, she again asked her, "Where were you during all of this? Who were you with?" and the defendant replied, "I don't know." Thus, applying the considerations set out in Buck, we first conclude that the State was accurate in asserting that one of the defendant's aunts had testified that the defendant, although asked, had not revealed where she was at the time of her mother's murder, other than initially saying she had been with "Chris."

As for the intent of the prosecutor in making the statement, the prosecutor explained that the statement referred to prior testimony in the trial. There was, in fact, such testimony, as we have set out. However, instead of quoting the actual words spoken by Cindy Eidson, and reminding the jury she had asked the defendant this question, the State's closing argument instead began, "Just tell us where you were. That's all we're asking, Noura." Thus, while the statement did make the same basic request as had Cindy Eidson, it could have been interpreted as if it were being asked of the defendant by those in the courtroom, which included the jury. On the other hand, the word "we" could be interpreted to mean that Cindy Eidson was asking the question on behalf of the victim's family. Because of the immediate and to-be-expected objection from defense counsel, the record cannot reflect whether the State would have followed the objected-to statement by explaining this was the question asked by Cindy Eidson to the defendant. There is risk to the State in rephrasing witness testimony, especially when it focuses on the fact that the defendant elected not to testify. The upshot of all this is that we cannot conclude that the prosecutor's beginning to her rebuttal argument, though certainly dramatic, was improper.

As we will discuss in detail in our analysis of the evidence, the State presented evidence that the defendant had both motive and opportunity to murder the victim. There was much proof of heated arguments between the two over the defendant's aimless and casual lifestyle and use of drugs. Before the victim was killed, the defendant had questioned her about the assets the defendant would receive were the victim to die. In our review of the sufficiency of the evidence, we will review in detail the activities of the defendant during the early morning hours and conclude, as will be set out, that this does not rise to the to the level of reversible error, given the prompt and thorough curative instructions from the trial court and the strength of the circumstantial evidence against the defendant.

### B. Additional Claims of Prosecutorial Misconduct

As we will review, the defendant asserts that the State committed prosecutorial misconduct in a number of instances. The State denies that the acts complained of constitute prosecutorial misconduct.

### 1. Alleged Suppression of Brady/Giglio/Jencks Material

Subsequently, as a separate issue, we will review in detail the defendant's claim that the State suppressed evidence which would have impeached Andrew Hammack. Our determination is that this claim does not constitute reversible error.

### 2. State's Opening Statement

The defendant asserts the prosecutorial misconduct began with the prosecution's opening statement and the phrase, "Give me the f*cking money," delivered "to the jury in close proximity and at a deafening decibel level." This statement came near the beginning of the State's opening statement, referring to the troubles brewing between the defendant and the victim. No contemporaneous objection was made by the defense to the statement. We note that the statement is an exact quote of the testimony of a neighbor, Sheila Cocke, who said that she overheard the defendant say this to the victim. Thus, we cannot conclude that the prosecution's making of this statement constitutes prosecutorial misconduct, and, even if that were the case, the issue would be waived because no timely objection was made.

The defendant argues that the State committed reversible error in beginning "in close proximity [to the jury] and at a deafening decibel level, 'Give me the f*cking money!'" As to this issue, we first must observe that, as to our reviewing the trial, we are limited to the transcript, which gives no hint as to the emotion or volume with which a statement is delivered. The State responds that the defendant has waived this issue by not objecting to the allegedly improper statement at the time it was made. We agree with the State that the

defendant has waived this issue for appeal. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

### 3. PowerPoint Presentation

Next, the defendant argues that the State's PowerPoint presentation, during closing argument, constituted misconduct because it included a "compilation of photographs of many of the less genteel witnesses, groomed for" the photographs, none of the photographs having been authenticated or seen by the defense prior to their use by the State. We have examined the PowerPoint presentation in its printed form. It consists of a number of items, including a listing of the elements of first degree murder, definition of terms, including premeditation and direct and circumstantial evidence; a number of photographs and maps, including a time-line showing, according to witnesses, the defendant's whereabouts at various times on June 4-5, 2005; phone logs of various telephone numbers; photographs of witnesses, apparently taken showing their appearance as they appeared before the jury; a photograph of the defendant making a purchase at a Walgreens store on June 5, 2005, as well as the sales receipt and photographs of the items she purchased; and photographs showing the defendant's appearance and clothing before and after the victim had been killed. The PowerPoint presentation appears to match the State's closing argument to illustrate and recall for the jury the proof regarding the defendant's clothing, her locations and activities at various times during June 4-5, 2005, and remind the jury of the witnesses and their testimony by showing photographs of witnesses as they appeared before the jury. We realize that defense counsel did not see this presentation before it was shown to the jury and, thus, may not, at the time, have recognized a basis for the objection which they have made on appeal. However, we cannot conclude that the State's use of this presentation was prosecutorial misconduct. Rather, it was a means to help the jury to recall the testimony of the many witnesses who testified and to understand the State's theory of the case.

Given the large number of lay witnesses who testified during the trial, many giving very similar testimony, we cannot conclude that the trial court erred in concluding that the State was permitted to remind jurors, during closing arguments, of the appearance of the various witnesses as the State recounted their testimony.

### 4. Comment on Defendant's Right to Remain Silent

The defendant argues that the State's command during closing argument to the defendant, "Just tell us where you were. That's all we are asking, Noura" violated the defendant's Fifth Amendment rights. Previously, we have reviewed this statement by the prosecution to determine whether it violated the defendant's rights against self-incrimination

and concluded that it did not. As we explained, the safer sequence for the State, in reminding the jury of Cindy Eidson's asking the defendant where she had been during the period when the victim was killed, first would have been to remind the jury of the source of this testimony before repeating it for the jury, and, then, quoting the testimony as said by Eidson. Having concluded that the State's proceeding first with a statement which was not exactly what the witness said did not violate the defendant's Fifth Amendment rights, we, likewise, cannot conclude that it constitutes prosecutorial misconduct.

In making its argument for cumulative trial errors, the defense asserts that the trial court incorrectly concluded that the State's making this statement did not constitute reversible error. Previously, we have determined that this ruling by the trial court was supported by the evidence. Accordingly, this claim is without merit.

### 5. References to the Deity

Additionally, the defendant argues that the State "violated well settled Tennessee law by invoking religion in [its] attempts to inflame the passions of the jury." The bases for this issue were two references made to God in the State's rebuttal argument. The first regarded Officer Payment, the crime scene investigator:

> Don't forget that after about the third day of Officer Payment being on the stand and being without sleep for three days, he was passed a picture that eventually was discovered had been altered. Had been blown up, altered, and tried to pass off on, <u>God love him</u>, Officer Payment, as one of his own.

> And he looked at it at first and he said I don't remember taking that picture, but maybe I did. All right.

> He didn't. He didn't take that picture. He didn't alter that picture. He didn't crop that picture. He didn't enlarge that picture. None of it.

> And that was discovered and he was asked about that, and it was pointed out that it all came from that side of the table.

> Why would you have to do that? If we're all here about seeking truth, if we're all here to make sure justice is done, if we're all here because we're not sure who really killed [the victim], why do you got to monkey around with the evidence? Why do you have to alter things and crop things and enlarge things and try to trick Officer Payment? Just trick him.

The second example cited by the defendant occurred when the State was suggesting

to the jury the thoughts of the defendant on June 4-5, 2005:

>    Do not be fooled, ladies and gentlemen. Do not be fooled into thinking that we have to tell you exactly when that premeditation was formed. We don't.

>    All you have to show is that it was there before the killing.

>    How do we know that? Nobody walked in here and told you what was going on in [the defendant's] mind. Yeah, they did. Oh, yeah, they did. And it was ugly.

>    Give me my F'ing money. Shh, let's go inside. Can you believe my mom's going to get a restraining order on Perry? Can you believe my mom's drug testing me? Can you believe my mom won't let me continue to take drugs and whup it up and goof off in school? Can you believe it?

>    The nerve of a parent. A thirty-nine year old single mother, <u>God love her</u>, doing the best she can.

>    The nerve of her to want to straighten her daughter out.

>    The nerve of her to say I don't want you around Perry Brasfield.

>    But I love Perry.

>    The nerve of her to drug test her.

>    The nerve of her to not let loose all of [sic] this money.

>    The only thing that stood between the defendant and her freedom and her money and Perry Brasfield was her mother.

We respectfully disagree with the defendant's characterization of these references as "attestations of divine approval, using God's prestige and power to vouch for a person." The cases relied upon to support this claim review the use of inflammatory language, which simply is not comparable to the objected-to statements of this appeal.

In <u>State v. Cauthern</u>, 967 S.W.2d 726, 737 (Tenn. 1998), our supreme court determined that the following argument, "while highly improper, did not affect the verdict to the prejudice of the defendant":

First, the prosecution's reference to the Lord's Prayer and its requests for the jury to "combat and destroy" the "evil one" amounted to the use of biblical passages that the Court repeatedly has held to be improper and inflammatory. Second, the frequent references to the defendant as the "evil one," used as epithets to characterize the defendant, were also improper and potentially appealed to the bias and passion of the jury. Third, the statements that the jury should "do its duty" and that its verdict should send a message to the community constituted a plea for general deterrence, which we have held has no application to either aggravating or mitigating factors. Finally, the argument impermissibly suggested to the jury that the defendant, as an incarnation of "the evil one," should be sentenced to death not only for the offense charged but also for other heinous offenses committed by "the evil one" in the form of other notorious murderers. In summary, we find that the State's argument was highly improper.

Id. (internal citations omitted).

Likewise, in State v. Thomas, 158 S.W.3d 361, 414 (Tenn. 2005), the court determined the State's "repeated references to Defendant Thomas and Defendant Bond as 'greed and evil' was improper" but was "harmless in the context of the entire argument."

We believe that the following opinion is instructive in this regard. In Seidman v. Paradise Valley Unified School District No. 69, 327 F. Supp. 2d 1098, 1102 (D. Ariz. 2004), the school violated free speech rights of two students' parents in requiring them to delete the word "God" from the inscription, "God Bless Quinn, We Love You Mom and Dad," and a similar inscription on a wall tile which would be incorporated into a display appearing on an interior wall of school. The court explained the ubiquity of the phrase "God bless":

The phrase "God bless" is commonly used in our culture in a number of different contexts. The phrase "God Bless America," has historic and patriotic significance. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, [35-44], 124 S. Ct. 2301, 2322-27, 159 L. Ed. 2d 98 (2004) (O'Connor, J., concurring) (discussing historical and ceremonial deism). Answering a sneeze with the words "God bless you" is a common tradition that is seen as an indication of politeness. "God bless!" is sometimes used, in place of an expletive, to express frustration. And, as in the context of the Seidmans' tiles, the words "God bless" can be used as a general invocation of divine assistance to, or blessing upon a specific individual. One thing is true of all the examples given, including the excluded tiles: use of the words "God bless" refers to religion in only the most general sense. The statements do not exhort any

particular faith or identify any particular religion. The Court does not believe that the school district's acceptance of the Seidmans' messages to their children, the "God Bless America" tile, or the "God Bless our School" tile would have created an Establishment Clause violation.

Id. at 1112.

There is no basis for our concluding, as the defendant argues, that the State's use of the phrase, "Officer Payment, God love him," was a "suggestion to the jury to rebuke the Defense for its effective repudiation of the murder investigation through the witness." Rather, we conclude that the State, in using the phrase "God bless" in a lengthy rebuttal argument, was utilizing it as an expression which has other than religious connotation. This issue is without merit.

Additionally, the defendant argues that the State invoked religion during its closing arguments by use of phrases, referring to the victim and a witness, "God love her, doing the best she can," and "God love him." These were isolated statements in a very lengthy argument and, thus, we cannot conclude that they were intended to invoke religion.

Further, the defense argues that the State suggested God approved of certain witnesses, as the State referred to them as "God love him," and "a thirty-nine-year-old single mother, God love her, doing the best she can." The State responds both that the claims are waived because the defendant failed to make contemporaneous objections to the alleged improper statements and the statements were "passing comments" rather than "invocations of religion."

We agree with the State that these claims were waived because contemporaneous objections were not made to the two statements. Even if we considered the claims on their merits, we would conclude that they are without merit, for the two short phrases are a small part of lengthy arguments by the State and only arguable invocations of religion, if at all.

### 6. Comment on Length of Trial

The defendant asserts that the State implied the jurors should punish the defendant because she would not tell them where she was at the time of the crime and that this refusal subjected them to "one of the longest, if not the longest, trials in Shelby County." The defendant argues that the State, in its rebuttal arguments, was "improperly appealing to the conscience of the community and subtly encouraging the jury to react to all crime in the community by convicting the [d]efendant as it is the duty of good citizenship."

This statement was made during the State's rebuttal argument, which covers over thirty pages of the trial record. The defendant did not object to the statement as it was made, and we cannot agree that it was not within the allowable bounds for final arguments.

## 7. Assumption of Facts

The defendant asserts that the State treated as established certain facts which were not proven at trial. We do not agree with the defendant's assertion. It is correct, as the defendant argues, that in closing argument, the State said, "Mom was drug testing her. She tested positive." However, the context of this statement was describing the drug testing, among other factors, as making the defendant angry at the victim and providing a motive for the murder. Likewise, the context of the statement, "[t]he nerve of [the victim] to drug test [the defendant]," was arguing why the defendant was angry with the victim. We conclude that these statements are within the boundaries allowed for final arguments.

## 8. Additional Improper Arguments by the State

The defendant asserts that, from the State's arguments the defendant should "just tell us where you were" and "forced [the jury's] sequestration for two arduous weeks because she refused to confess her guilt," resulting in a lengthy trial, came "perilously close to indicting the entire justice system." The State responds that, to make this argument, the defendant has "taken fragments and pieces . . . of the prosecutor's closing and argued that the State was asking the jury to punish the defendant for interrupting and changing their lives and making them participate in the longest trial in Shelby County."

We note that, as the State argues on appeal, the defendant did not make contemporaneous objections to these statements. Thus, we conclude that these claims are waived. Even if not waived, we would conclude that they are without merit for they are isolated statements in very lengthy closing arguments and not representative of the arguments as a whole.

## 9. Personal Attacks on the Defendant

The defendant asserts that the State's rebuttal argument was intended to "compensate for the significant errors in the police investigation" and to suggest that the jury should convict the defendant because it was "the duty of good citizenship." As evidence of these claims, the defendant points to the following arguments of the State during closing argument:

> When you go back to the jury room, I want you to remember that all of this stuff, all of this, was brought to you by the State of Tennessee. The good, the bad, the ugly.

If we were all guilty of this conspiracy theory that the defense is accusing us of, don't you think we'd have [the defendant's] blood on that bloody sheet?

Give me a break. We don't pick and choose our crime scenes. We don't pick and choose the investigations. It is what it is. And it means nothing in this case.

But ladies and gentlemen, this is the State of Tennessee, and I would like to think that we live to a higher standard.

You have worked so hard. And part of what's going on in the country right now, and I would like to think in our community, that we're going to take part of it, to roll up our sleeves and get to work.

To not sit back and say, yeah, well, the police didn't do this and the police didn't do that, so, I'm going home.

That's not who we are. It's all fine and well for the defense attorneys to make fun of Mr. Payment or criticize the crime scene investigation or to whine about this, complain about that. I wish we had this, I wish we had that. Yeah.

You know what we wish? We wish daughters didn't stab their mothers fifty times. Wouldn't that be a great day in the State of Tennessee?

But the sad, ugly, horrible truth is that it's happened. And we have to deal with it. And we have to look at it and open it up and roll our sleeves up and get to work.

And we can't turn a blind eye because that easy fix isn't there.

This is about something much bigger.

Attorneys are allowed latitude in closing arguments, and these statements are within the allowable boundaries.

### 10. State's Improper Use of Hearsay Testimony

The defendant argues that the State improperly used hearsay testimony as proof of facts. The testimony in this category is of Eric Sherwood, saying he "overheard" the victim

say that the defendant had "failed a drug test" and that the defendant "had tested positive for drugs." The trial court ruled that these statements were allowed as exceptions to the hearsay rule to show the state of mind of the declarant. The record supports this determination.

## 11. State's Emotional Appeal in Closing Argument

As additional examples of improper arguments, the defendant points to the following:

> perfect storm . . . snapped . . . the volcano erupting . . . [f]or every time [the victim] told her no, that knife went in deeper and deeper . . . [the] thirty-nine year old single mother, God love her, doing the best she can . . . fighting for what little bit of life she's got left. You are here for her. You are what stand between the [d]efendant and the truth. You are what stands between the State of Tennessee and justice.

The defendant argues on appeal that these statements during the State's closing arguments were intended to incite the "passions and prejudices" of the jury. The defendant acknowledges that she did not object to these statements as they were made. We note that, in the transcript of the State's closing arguments, these statements appear at widely scattered places in the argument. We decline to determine whether, collectively, these scattered statements rise to the level of prosecutorial misconduct and conclude that the issue is waived because contemporaneous objections were not made to them. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1).

## V. Third Statement of Andrew Hammack

The defendant argues that she is entitled to a new trial as the result of the State's suppression of the third written statement of the State's witness, Andrew Hammack. While the State acknowledges that this statement should have been disclosed, it contends that the failure to do so was unintentional and did not affect the outcome of the trial.

In our review of this issue, we first will set out the relevant chronology, noting that the statements are not examples of clarity, especially when attempting to compare one to the others.

Andrew Hammack made three statements to Memphis police officers, the first dated June 7, 2005, at 1:42 p.m., in which he related both his dealings with the defendant on June 4 and 5, 2005, as well as explained his June 5, 2005 text message to her:

> I talked to Koale [Madison] and they were just riding around and hanging out. It was in between 4:00 and 6:00 p.m. Melanie Barnett called

Koale from her cell phone and he was with [the defendant]. When Koale said he was with [the defendant], Melanie hung up because her and [the defendant] weren't speaking at the time. Later on between 11:00 p.m. and 1:00 a.m., I called her and she said she was on the way home from a party, she was by herself and she told me to meet her at her house in 15 minutes. I called her 15 minutes later when I got back to my house and she told me that she was in front of her house waiting on me. I told her that I was at my house and then she said she was about to go inside and she would talk to me later. Then, at 3:50 a.m. I texted her. She was at Eric's, she wanted to meet up and I was on my way home from Krystal's and I had been drinking and I didn't want to drink and drive so I didn't go over to her house. At 5:00 a.m. she sent me a text message that said "answer", but I didn't cause I was already asleep at the house. I called her back at 10:59 a.m. and she didn't answer, but I already knew her Mom had been killed when we passed by the house that morning. I had tried to call her and get in touch with somebody, but couldn't, so we drove past the house it was like around 11:15 a.m.

    . . . .

    I texted [the defendant] at 3:50 a.m. and asked her what she was doing. She texted me back like at 4:28 a.m. and said she was sitting at Eric's and she wanted to see me. At 4:30 (I texted her) I told her that I wanted to see her too. (I was on my way back from Krystal and Ian was with me . . . I was going to drop Ian off and go to her house, but when I got to my house, I just went to sleep and I had been drinking and I didn't want to drive.) Then, at 5:00 she texted me telling me to "answer," but I didn't get it until the next morning.

Hammack's second statement was given three days later, on June 10, 2005, beginning at 8:55 a.m. In that statement, he was asked about a telephone call from the defendant on June 5, 2005, which he had not spoken of in his first statement, as well as a statement she had made to him at that same time:

Q: Is this the second statement that you have given to Sgts. Merritt and Justice regarding this investigation?

A: Yes.

Q: Did you remember receiving a phone call from [the defendant] on the night of the incident other than what you previously told investigators in your statement?

A: Yes, from the Jackson residence and I didn't answer it.

Q: Do you remember the approximate time that you received the phone call from the Jackson residence to your cell phone?

A: It was within the time period of 12:00 a.m. to 5:00 a.m.

Q: Do you recall a statement that [the defendant] made on June 5, 2005 when you were supposed to meet her at her residence?

A: Yes, she wanted me to meet her outside and walk inside with her . . . that was said after too. After the incident occurred, I was visiting her at Regina [Hunt's] house and she said it again to me.

Hammack's third statement, which was not produced to the defense until February 26, 2009, five days after the verdict had been returned, was handwritten by him on correspondence his roommate had received from the University of Memphis. His handwriting makes the statement somewhat difficult to decipher:

On Saturday June 5th close to mid [sic] me, Ian, Jayron, and Marcus went to pick up Buck from his house and he didn't come out because he said he had the ACT in the morning. So we met up with R.G. at the [P]ar[a]diso after we left Bucky's. I then got in the car with Ryan. We went to Matt Milners and then we went to a party with Ryan. We were at the party and [the defendant] called Ryan's phone looking 4 me because I left my phone with Ian and he told [the defendant] that I was with Ryan. We were at this party for a lil bit the[n] we left because Ryan tried to start a fight. We went back and met Ian, Marcus, and Jayron which they were in my truck. I got in my truck. Ian was driving[,] Marcus in front[,] Jayron in the back asleep. So then Ian drove us back to the house. When we got to the house we came inside (I wanted to come home because I was rolling on XTC so we came home.) Later on Greisham called and asked if he could come over. We sat here (house) for a while then Andrea and Chelsea came over. By this time Eddie was asleep because Eddie's g/f doesn't like Chelsea being at our house. At 3:57 me and Ian wanted to go to the strip club. We were on [G]etwell and we stopped at a gas station and me and Ian decided to go back home.

When we got there Andrea and Chelsea had left. When I got there if [sic] Whit and Garrett still up. About 10 min later, Ryan called and he wanted to stop by and hang out so he stopped by. Ian was sleeping now. So it was me, Garrett and Ryan . . . . Later on Ryan called Matt Milner and he wanted

-65-

to hang out so me, Ryan, and Garrett went to Matt's and he didn't open the door so we left and came back home. We fell asleep then Eddie came downstairs in the morning and woke me, Ian, and Jayron up and told us [the defendant's] mom got killed last night.

On appeal, the defendant explains why, in her view, Hammack's third statement is material and entitles her to a new trial. According to the defendant, it reveals that "on June 4-5, 2005, Hammack was intoxicated on street Ecstacy, a hallucinogenic, amnesiatic substance, and was also using marijuana," that, inconsistent with his previous statements, he admitted he was at a movie theater "within yards of the decedent's home after 1:00 a.m." on June 5, and that he was driving around until 3:37 a.m. when he went to a "bar featuring nude entertainment," all facts not disclosed in his first two statements or during his direct examination. The defendant argues that these statements contradict Hammack's prior statements and trial testimony and "establish that [he] either repeatedly lied to the police about his conflicting alibis, activities, whereabouts, and substance abuse" during the time the crime occurred or show that "he had drug induced ante-grade amnesia, frontal lobe disturbance, confusion, and confabulation as to his conduct on June 5th." Had this third statement of Hammack been timely provided, the defendant argues, he would have been cross-examined about the differences between it and his first two statements, including his whereabouts between 1:00 a.m. and 3:37 a.m. on June 5. The statement could have been used, according to the defendant, to "refute the State's claim that their case eliminated '. . . every other person in the world as responsible for killing [the victim]'" and that the defendant was "the only person in the world who could have committed this murder." The defendant further argues that the suppressed statement limited her ability to investigate the case, prepare her defense, cross-examine witnesses, and present her defense to the jury. The State responds that Hammack's third statement does "not in any way exculpate the defendant." We will review these contending arguments.

In reviewing this issue, we first note that, from the defendant's cross-examination of Hammack, it is apparent that, prior to the trial, he had been interviewed by and provided a statement to an investigator for the defendant. Exploring Hammack's degree of intoxication during the June 4-5, 2005 period, defense counsel asked, after Hammack denied that he had been "very wasted," "How about the word blotto? Do you remember telling my investigator Clark Chapman that?" Hammack responded, "I don't recall that." Additionally, Hammack was asked during cross-examination if he had left his "phone anywhere" or lost it; if he had been "to a topless place that night with somebody"; and if he knew "Marcus Dalugich," whom he identified as a friend but could not recall if he had used Dalugich's telephone the evening of June 4-5, 2005. From these questions, it is apparent that the defense had information regarding Hammack's activities, during this period, which had not come either from his first two statements to police officers or during his direct examination.

We now will review this issue.

At the hearing on the motion for new trial, the court concluded that even if Hammack's third statement had been timely produced to the defendant, the outcome of the trial would not have been changed:

> So [it presents] a more detailed account of where he was and the fact that he had been using ecstasy. Looking at that, considering also in grounds 8, 14, 23, and 37 [of the motion for new trial], the fact that if he were cross-examined by that statement, the defense could have used it to ask him about his use of ecstasy, whether or not he knew about the events of that night.

> Also, considering the fact that they could check to see if Ryan Gresham w[as] home that night, so whether or not that third statement was true, or not, that more detailed statement, in my mind, would not have had an effect on this trial.

> I find that not turning this over under [Tennessee Rule of Criminal Procedure] 26.2, I don't have any proof to show that it was intentionally withheld, if the [S]tate wanted to withhold something, they could have withheld other things, much more damaging than this.

> It was clear when Mr. Hamm[a]ck testified that all of these kids, except for maybe the girl that we took the deposition on, were all doping and drugging and all being where they were not supposed to be, Andrew Hamm[a]ck included, even though he wasn't exactly with the other private school crowd, he was one of them. And I find that any cross-examination of him about this third handwritten note that he gave the police would not have affected the trial, or the verdict.

> I find it wasn't proper for the [S]tate to forget it. It was not proper for the [S]tate not to turn it over, but it was unintentional. [The prosecutor] did not withhold this on purpose.

> I am going to deny them, given this, grounds 8, 14, 23 and 37 [of the motion for new trial] as well, looking at ground 40 in accordance with the doctrine, etc. They're saying, in error. The defendant wasn't afforded a fair trial and was prejudiced by the constitutional and non-constitutional errors at trial.

We will review this ruling by the trial court that the State's failure to timely produce

Hammack's third statement was unintentional and that, even had the production been timely, its use on cross-examination of Hammack would not have resulted in a different outcome of the trial.

On February 26, 2009, five days after the jury had returned its verdict, a copy of Hammack's third statement was provided to counsel for the defendant, as an attachment to a court filing styled "State's Notice Of Omitted Jencks Statement in Relation To The Testimony Of Andrew Hammack." According to this document, junior counsel for the State, in preparing during the trial for examination of Detective Miller, noted Miller's June 13, 2005 supplement, which, according to the notice of the statement, had been provided to the defendant prior to the trial, made reference to an additional statement which Hammack had apparently made to Detective Miller on June 13, 2005, approximately one week after his first two statements.

On appeal, the defendant presents a number of arguments as to the State's failure to timely provide a copy of Hammack's third statement. First, the defendant notes the difficulty she had in obtaining discovery from the State, saying previous requests for the State to provide copies of Brady material had resulted in eight hearings on defense motions to compel discovery. Additionally, the State advised the court on February 9, 2009, as the trial began, that defense counsel had been provided with all Jencks material the past Friday. Further, the State did not provide a copy of Hammack's third statement during the trial testimony of Detective Miller or Hammack, himself, and did not correct the testimony after both Miller and Hammack testified that Hammack had made only two statements to investigators.

The State responds that Hammack's third statement does "not in any way exculpate the defendant." Accordingly, we now must determine whether this statement was material and if, more likely than not, its timely production would have affected the outcome of the trial.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

In Kyles v. Whitley, 514 U.S. 419 (1995), the court further explained "materiality":

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines" confidence in the outcome of the trial.

Id. at 434 (citing Bagley, 473 U.S. at 678).

The holdings in Brady and Kyles subsequently were applied in Strickler v. Greene, 527 U.S. 263 (1999). In that case, Strickler, the petitioner, had been charged, along with Ronald Henderson, with the abduction, robbery, and murder of a college student, and both were convicted of all three offenses. As to the homicide case, Henderson was convicted of the noncapital offense of first degree murder, while the petitioner was convicted of capital murder and was sentenced to death. Id. at 266. The defendants were tried separately, and, at both trials, the witness Anne Stoltzfus described "in vivid detail" the abduction of the victim. Id. Subsequently, seeking habeas corpus relief, the petitioner argued that the State should have provided prior to his trial, "documents prepared by Stoltzfus, and notes of interviews with her, that impeach significant portions of her testimony." Id. At the trial, Stoltzfus testified that she had "an exceptionally good memory" and had "absolutely no doubt of [her] identification" of the petitioner as a participant in the crimes. Id. at 272-73. Following the trial, the petitioner's counsel came into possession of various items which "cast serious doubt on Stoltzfus' confident assertion of her 'exceptionally good memory.'" Id. at 273. These documents included a handwritten note of a Detective Claytor, who was told by Stoltzfus two weeks after the crime that she could not identify the victim; interview notes of the same detective that "she was not sure whether she could identify the [two defendants] but felt sure she could identify the white female" who had accompanied them; and a letter written by Stoltzfus three days after her first interview by Claytor, in which she told him that "she had not remembered being at the mall [where the crime had occurred], but that her daughter had helped jog her memory." Id. at 273-74. In that letter, she had described the victim's automobile without "mentioning the license plate number that she vividly recalled at the trial." Id. at 274. In another letter from Stoltzfus to Detective Claytor, she thanked him for his "patience with [her] sometimes muddled memories." Id.

The district court concluded that, had the testimony of Stoltzfus been discredited, there was a reasonable probability that the petitioner would have been convicted of first degree rather than capital murder, the jury reasoning that Ronald Henderson, the other person charged with the crime, "rather than the petitioner, was the ringleader." Id. at 291. The Supreme Court, however, rejected this conclusion, explaining that, even if the testimony of the

eyewitness had been "entirely discredited, the jury might still have concluded that petitioner was the leader of the criminal enterprise because he was the one seen driving the car by [witness] Kurt Massie near the location of the murder and the one who kept the car for the following week [and] [witness Donna] Tudor testified that petitioner threatened Henderson with a knife later in the evening." Id. at 292 (footnote omitted). The court observed that "[m]ore importantly, . . . petitioner's guilt of capital murder did not depend on proof that he was the dominant partner:  Proof that he was an equal participant with Henderson was sufficient under the judge's instructions. Accordingly, the strong evidence that Henderson was a killer is entirely consistent with the conclusion that petitioner was also an actual participant in the killing.  Furthermore, there was considerable forensic and other physical evidence linking petitioner to the crime.  The weight and size of the rock [used to kill the victim], and the character of the fatal injuries to the victim, are powerful evidence supporting the conclusion that two people acted jointly to commit a brutal murder." Id. at 292-93 (footnotes omitted).

We will review the effect of the State's failure to timely produce Hammack's third statement.

As to the first and second considerations set out in Edgin, it is clear that the defendant's requests for discovery included the third statement of Hammack, and the trial court found that, at the least, the statement should have been provided following his testimony. Additionally, the court found that the State's failure to timely provide the statement was an inadvertent mistake.  Certainly, the statement should have been timely provided.

We next must consider the third and fourth considerations, whether Hammack's third statement was favorable to the defendant and was material.  The trial court concluded that the availability of this statement during the defense's cross-examination would not have had an effect upon the trial.  As to the defendant's arguments that this statement would have shown the extent to which Hammack was under the influence of drugs and alcohol on June 4-5, the court found that he had testified at trial that their "group" "were all doping and drugging and all being where they were not supposed to be."  We agree.  From the testimony of Hammack and others, the jury could have determined that he and his friends were regular users of alcohol and illegal drugs and, to varying degrees, some were leading nonproductive lives.

Hammack's statements are rambling, somewhat difficult to follow, and become more confusing when an attempt is made to try and compare them.  Although the defendant argues on appeal that the third statement was exculpatory because it established that, during the period in which the victim was apparently killed, Hammack was "rolling on XTC" and near the victim's residence, we agree with the trial court that these facts were of slight exculpatory value. Given the contents and tenor of Hammack's first two statements, and his admission that he was intoxicated, we cannot conclude that the information he was using ecstasy at the same

-70-

time would benefit the defense. Additionally, as we have set out, it is apparent that an investigator for the defendant had taken a statement from Hammack, although the record does not show the extent to which that statement parallels, if at all, Hammack's third statement. Further, we cannot attach importance to the State's assertion during closing arguments that its proof showed none of the other witnesses were near the victim's residence when she was slain. This was hyperbole, and, since the evidence did not suggest that Hammack had a motive to kill the victim, we do not believe that proof of his whereabouts would have benefitted the defendant. Thus, like the trial court, we cannot conclude that Hammack's third statement was exculpatory or that the defendant was prejudiced by its untimely production.

Following the submission of her briefs in this matter, the defendant directed the court to the recent holding of the United States Supreme Court in Smith v. Cain, 565 U.S. __, 132 S. Ct. 627 (2012), in which the court considered whether reversal of five convictions for first degree murder was required when the sole evidence against the defendant was the testimony of a single witness and not disclosed by the State at the trial were undisclosed statements by the witness to the State's lead investigator that the witness "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." Id. at __, 132 S. Ct. at 630. The court explained the non-disclosure of this evidence required reversal of the convictions because it was "both favorable to [the defendant] and material to the verdict." Id. at __, 132 S. Ct. at 631. Applying the holding in Cone v. Bell, 556 U.S. 449, 469-70 (2009), the court explained that the "sole question" before it was whether the witness's undisclosed "statements were material to the determination of [the defendant's] guilt." Id. at __, 132 S. Ct. at 630. The evidence was "material" if there was "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Id. Noting that the witness's "testimony was the *only* evidence linking [the defendant] to the crime," the court concluded that "the likelihood of a different result [was] great enough to 'undermine[] confidence in the outcome of the trial.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Accordingly, the defendant's five convictions were reversed.

In the present case, by contrast, the proof against the defendant was circumstantial, presented through testimony of a number of witnesses, in addition to documentary proof, rather than that of a single eyewitness, as was the situation in Smith. Further, the undisclosed statement of Andrew Hammack would not have had the impact on the prosecution as did that in Smith, for its effect would have been, as the trial court concluded, to make somewhat more tangled Hammack's two previous versions of his and the defendant's activities of June 4 and 5, 2005. While it is true, as pointed out by the defendant, that Hammack's third statement differed somewhat from his first two statements, we cannot conclude the addition that he was "rolling on XTC" or had been in the vicinity of the victim's house that evening, had it been disclosed, would have changed the verdict. Accordingly, we conclude that the holding in Smith is not applicable to this matter, and the record supports the trial court's determination that timely production of Hammack's third statement would not have affected the outcome of

the trial.

## VI. Sufficiency of the Evidence as to Second Degree Murder

## A. Applicable Law

Relying upon the opinion of our supreme court in State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993), the defendant argues that the evidence was insufficient to sustain her conviction for second degree murder because the State failed to establish facts "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the [d]efendant and the [d]efendant alone." Among her claims, she asserts that the "forensic evidence conclusively exonerated [the] [d]efendant," because the "murder bed" contained the blood of two unidentified persons, no blood from the defendant was found at the scene, and the victim's blood was found only in "minute places" on the defendant's shoes. Further, the "trace evidence" did not implicate the defendant; her shoes did not match footprints found throughout the house; her fingerprints were not at the crime scene, although the prints of an unknown person were on a condom wrapper near the victim and in a blood spatter on the footboard of the bed; no direct evidence connected the defendant to the homicide; Andrew Hammack "provided three conflicting, unverified" alibis for the time of the murder; and the defendant's manicured nails were undamaged and there were no injuries to her body, except for a small scar on her hand.

Following the parties' submission of their appellate briefs in this case, our supreme court adopted, in State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011), a different standard of review for circumstantial evidence, as subsequently explained in State v. Sisk, 343 S.W.3d 60, 66 (Tenn. 2011), explaining that in Dorantes, "we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State." Additionally, the court reminded that "our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." Id. at 67. Accordingly, it is by this standard that we review the sufficiency of the evidence.

In considering the sufficiency of the evidence to sustain the conviction, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the

credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of second degree murder, which is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the offense and from all the facts and circumstances surrounding the offense. See id. at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The evidence in this matter is largely circumstantial. As to its sufficiency to sustain the conviction, the opinion of this court in Hackney v. State, 551 S.W.2d 335 (Tenn. Crim. App. 1977) is instructive. In that case, the defendant was convicted of voluntary manslaughter after the body of his girlfriend "was found lying face down in the corner of a room [in the burned house they had shared] between a bed and a wall." Id. at 337. She had "suffered third and fourth degree burns" and had "three fractures of the skull." Id. at 337-38. A witness for the State testified that when he came upon the scene, "the entire house [was] engulfed by flames and the defendant's car [was] sitting in the yard. [The witness] called out but received no response from the car." Id. at 338. The witness left to summon help and, when he returned, the defendant's car was gone. Another of the State's witnesses told the jury that, after seeing the damage to the house, he drove to the home of the defendant's family, finding the defendant "on his way from his car to the house." Id. Asked if he knew where the victim was, the

defendant "replied in the negative, saying that he had been asleep in the car." Id. When told of the fire and asked if the victim might still be inside the house, the defendant replied, "'I'd say she could be,' and went into the house, presumably to bed." Id. When later questioned by police officers and the fire marshal, the defendant said that he and the victim had argued, he had slept in his car parked at the house, which had not been on fire when he awoke and drove away. At trial, he altered his explanation somewhat, saying that "when he awoke the house was completely engaged in flames and, seeing that there was no way to help [the victim], he left and drove home." Id. A subsequent witness, apparently testifying in rebuttal, said he "overheard [the defendant] make a phone call a day or two before, following which he announced, 'Somebody is going to get killed.'" Id. Although the defendant argued on appeal that the "wholly circumstantial evidence" was insufficient to sustain the verdict, this court explained why the evidence was sufficient:

> Considered in its totality, the evidence in the record does not preponderate against the jury's verdict. The proof demonstrates that the defendant and the deceased had been involved in an ongoing argument, which may be taken as a motive for [the defendant's] behavior. Furthermore, he was present at the scene immediately before and at the time of [the victim's] demise, giving him an opportunity to cause her death. His flight from the scene, his inconsistent statements following the event, and his apparent unconcern and lack of surprise or shock at the desperate plight of his lover all indicate a consciousness of guilt from which the jury could infer unlawful conduct on his part toward the deceased.

Id. at 339.

This court applied the rationale of Hackney regarding consciousness of guilt in State v. William Pierre Torres, No. E1999-00866-CCA-R3-CD, 2001 WL 245137 (Tenn. Crim. App. Mar. 13, 2001), reversed in part on other grounds, 82 S.W.3d 236 (Tenn. 2002), in which the defendant had been charged with first degree murder by child abuse resulting from the death of his fifteen-month-old son. In that case, a nurse was allowed to testify that, as an emergency room physician attempted to resuscitate the defendant's non-responsive son, the defendant appeared "arrogant" and "unconcerned," which was "consistent with his earlier hesitation in calling 911 [from his home] upon observing his child's critical condition." Id. at *4, *39. Explaining that the defendant's "deficit" in this regard "was inconsistent with his simultaneous claims of accidental injury," the court concluded that "this deficit was one circumstance from which, when considered with the other facts and circumstances in evidence, the jury could legitimately infer a consciousness of guilt." Id. at *39.

We will apply the rationales of Hackney and Torres in reviewing the defendant's actions before and after the murder of her mother.

-74-

## B. Defendant's Motive

As we have set out, a number of the defendant's friends testified as to conflicts between the victim and the defendant because of the defendant's continuing use of various illegal drugs and indifferent attitude towards her education. The victim's sister, Cindy Eidson, told of an "all night" conversation, while in Florida on Memorial Day weekend 2005, among her, the victim, and the defendant, during which the victim told the defendant that she wanted her to go to boarding school because the defendant was not taking the tests in her home schooling program, was "partying all the time," and, at age 18, had not finished high school. Eidson related that, during this same trip, the victim received a telephone call informing her of several teenagers having a party at her house in Memphis. The defendant at first denied knowledge of the party but admitted the next day that she knew of it, resulting in a "heated" argument between the victim and the defendant. After that, "everything was really cold . . . and distant" between the two. Eidson further testified that the victim told the defendant that she was going to be drug-tested and sent to a boarding school. Eric Sherwood, the victim's brother, testified that he had accompanied the defendant and the victim to Florida on this same Memorial Day 2005 trip, during which the victim told the defendant that her drug test showed she had drugs in her system and that she was going to be sent to a boarding or military school. Regina Hunt testified that, during 2005, she had observed the defendant talk to the victim "very disrespectful, ugly" on numerous occasions. Hunt testified that, in an angry tone, the defendant said she could not believe that the victim was going to seek a restraining order against Perry Brasfield because of the party at the victim's house while she was in Florida and also to begin drug-testing her. When the defendant and her friends were discussing their mothers the evening of June 4, 2005, the night before the homicide, the defendant said, "[M]y mom's a bitch and she need[s] to go to hell."

Additionally, there was testimony of the defendant's interest in the amount of the victim's assets, their disposition in case of the victim's death, and of the defendant's wanting money from the victim. Eric Sherwood testified that, during the 2005 Memorial Day trip to Florida, the defendant had asked the victim how many bonds she sold and how much money she made, to which the victim replied that the defendant was on the victim's life insurance policy and 401(k) policy and would be "well taken care of if something happened to [the victim]." Sheila Cocke, a neighbor of the victim, testified that, sometime after March 2005, she overheard the defendant and the victim arguing in their driveway, the defendant saying "[J]ust give me the F'ing money," and another argument, in the spring of 2005, when the defendant said to the victim, "Give me the money. I want the money."

From all of this testimony, a reasonable trier of fact could conclude that the defendant's motives to kill the victim were the defendant's wish to continue the lifestyle which the victim planned to terminate and the defendant's wish to have access to the victim's wealth.

## C. Defendant's Activities on June 4-5, 2005

We next will review the defendant's relevant behavior and activities before and after the crime.

As to the approximate time of the victim's death, Dr. Karen Chancellor testified that the time period of about midnight to five a.m. on June 5, 2005, was "more narrow" than but "entirely consistent" with her estimated time of death. Through a number of witnesses, the State's proof traced the activities of the defendant during this time period.

On June 4, the evening before the death of the victim, the defendant was wearing a yellow tank top, a white skirt, and gold sandals, as depicted in a photograph taken of the defendant and three of her friends at the home of Carter Kobeck and as testified to by Kirby McDonald. Later that evening around 11:00 p.m. at Perry Brasfield's house, according to Kirby McDonald, the defendant was wearing the same top but had changed into a dark denim skirt and black sandals.

Evidence was presented by the State as to the defendant's activities the morning of June 5, 2005. In her June 5, 8:35 a.m. statement to Sergeant Justice, the defendant said she had purchased cigarettes at 12:46 a.m. at a BP gas station near her home. Telephone records showed that between 12:10 a.m. and 1:08 a.m., fourteen calls were made to and from the defendant's cell phone.[5] At 12:59 a.m., a telephone call was made from the land line at the victim's residence to Clark Schifani, and, nearly the same time, a call was made from the defendant's cell phone to Schifani. At 1:00 a.m. and 1:06 a.m., calls were made from the defendant's cell phone to Perry Brasfield, the defendant saying that she was outside her home, smoking a cigarette, and asking if they could get back together. At 1:13 a.m., the defendant sent Brasfield a text message, saying she wanted to get back together. Two hours then passed with no outgoing calls or text messages from her cell phone. She next used her cell phone at 3:18 a.m. when she called Eric Whitaker, saying that she wanted to come to his house. When she arrived there, he was leaving to take a friend home and spoke with her only briefly. Next, there was an outbound text message from the defendant's cell phone at 3:34 a.m. The record does not reveal to whom this number was registered. Text messages were sent to or received from Andrew Hammack at 3:58 a.m., 4:04 a.m., 4:09 a.m., 4:28 a.m., and 4:59 a.m. At 4:14 a.m., midway through this series of communications, the defendant, photographed by a surveillance camera and wearing a gray sweatshirt and short skirt, paid cash for her purchase of a bottle of hydrogen peroxide, Nexcare first-aid paper tape, waterproof adhesive tape, Nexcare liquid bandage drops, and Skin Shield liquid bandages at a Walgreens pharmacy at

_____

[5]Although telephone records showed when calls were made to and from the land line at the victim's residence and the cell phone used by the defendant, the witnesses were somewhat vague as to which calls were answered and which were not.

Poplar Avenue and Massey Road. Although the defendant later told Sergeant Justice of buying gasoline at a convenience store at 6646 Poplar Avenue at 4:20 a.m., which she purchased with a credit card, she did not tell her of the stop six minutes earlier at the nearby Walgreens or of purchasing these first-aid supplies the morning of the victim's death. Most of these items, or their boxes, were recovered from the search of the defendant's vehicle on June 19, 2005. Also, in the pocket of the defendant's gray sweatshirt was found a paper towel on which was her blood. As to this time period, Andrew Hammack testified that the defendant left for him a text message or voice mail, saying that she was on her way back from Eric's and that she wanted him to meet her at her house. She had never before made such a request, according to Hammack.

Investigator Helldorfer testified that he arrived at the crime scene at 7 a.m. on June 5, 2005, and found that the walls and tub of the combination tub/shower were wet, as was the wash basin in the hall bathroom.

Officer Tankersley said that when he arrived at the victim's residence at approximately 5:15 a.m. on June 5, 2005, the defendant was wearing "a sweatshirt or fleece type jacket" which seemed odd because of the warm weather. Genevieve Dix testified that when she arrived at the victim's house shortly before 8:00 a.m. on June 5, the defendant was not wearing the type of clothes she usually wore but, instead, had on "a very odd outfit," which included a gray, long-sleeved sweatshirt which she had pulled down to her knuckles. The defendant held her arms at her side when Dix hugged her. Further, the defendant, although a smoker, did not smell like cigarette smoke but, instead, her hair smelled "fresh and sweet," and she was not wearing any makeup, although she normally wore heavy black eye makeup. Grace France testified that when she picked up the defendant two days after the murder to go shopping, the defendant was wearing an oversized, long-sleeved gray polar fleece jacket and she picked out only long-sleeved shirts, which seemed strange because, according to France, it was "ninety-five degrees."

From this evidence, the jury reasonably could have inferred that, during the two-hour period from 1:13 a.m. until 3:18 a.m., when the defendant's cell phone was silent, she killed the victim, cutting her hand as she did so. She then showered, washed her hair, and changed into different clothes. At 4:14 a.m., she purchased first-aid supplies from a Walgreens, which she used to treat the wound on her hand, and where she got a paper towel to wipe the blood from the wound. She paid cash for this purchase to avoid leaving a record with her credit card company, but, when she purchased gasoline six minutes later, she paid for the purchase by credit card. In her statement to Sergeant Justice later that morning, the defendant told of purchasing the gas but not of buying the first-aid supplies. From this, the jury reasonably could infer that the defendant was attempting to conceal her purchase of first-aid supplies.

There was testimony that, following the death of her mother, the defendant did not appear to exhibit grief or sadness. At her home, after the discovery of the victim's body, the defendant told Officer Tankersley that she was tired and wanted to go to sleep. Sergeant Justice testified that, as the defendant rode with her on Sunday morning, June 5, to police headquarters, she fell asleep and had to be awakened upon their arrival. When Perry Brasfield went to visit the defendant at her home the morning of June 5, she was walking her dog and "seemed all right." Later that afternoon, according to Caroline Giovannetti, the defendant said she wanted to shop or go to a movie. Regina Hunt, who had taken the defendant to Giovannetti's residence, said the defendant told her that she and Joey McGoff were going in the back so she could take a shower, but, instead, she smelled like marijuana when she returned. Later, the defendant said that she wanted to have a party. After Hunt told her that was not a good idea, the defendant said that she wanted to go to a movie, tanning, or shopping. When Sophie Cooley visited the defendant the afternoon following the victim's death, the defendant was "[j]ust not very emotional. Just upset but not overly upset." Later that day, she declined to accompany her aunt, Grace France, to Memphis police headquarters, wanting instead to be with her friends. She also told France that she wanted to retrieve from her house tennis shoes the victim had bought for her on the trip to Florida. France thought this request was "very unusual" because the shoes were part of the crime scene and had blood on them.

Thus, based upon the defendant's "unconcern and lack of surprise or shock" in the days following the discovery of the victim's body, her lack of interest in assisting police officers investigating the crime, and apparent lack of sadness, a reasonable jury could infer that the defendant did not exhibit the emotional reaction to be expected by a daughter over the horrific slaying of her mother.

The defendant gave varying explanations as to how she injured her hand. Sophie Cooley, Koale Madison, Kirby McDonald, and Brooke Thompson testified that they did not notice a cut or bandage on the defendant's hand the night of June 4, 2005. However, when Cooley and Thompson saw the defendant the afternoon of June 5, she had a small white bandage on her hand. She gave conflicting explanations as to the injury necessitating the bandage. She told Grace France that she had burned it while cooking but told Perry Brasfield she had cut her hand on broken glass inside the house while chasing her cat. She first told her uncle, Eric Sherwood, that she had cut her hand on barbed wire while jumping a fence at the Italian Festival but later told him she had burned it on the stove. When asked by Caroline Giovannetti about the bandage on her hand, the defendant "just shrugged it off." At Regina Hunt's house, the defendant explained that she had cut her hand on a beer bottle while at the Italian Festival and was drunk at the time. She also told Hunt that she cut her hand while trying to get her cat. She told Sergeant Justice that she had cut her hand on a broken beer bottle at the Italian Festival on Friday night and had returned to the festival on Saturday night. From these differing explanations, a reasonable jury could infer that the defendant intended to deceive as to how and when she had cut her hand.

-78-

Testimony showed that the defendant expected to be arrested for the death of the victim. Rebecca Robertson testified that as she and the defendant were standing in the office of the apartment complex and a police car summoned for another matter pulled into the parking lot, the defendant asked, "[A]re they here for me?" From the defendant's expectation that her arrest was imminent, a reasonable jury could infer that the defendant had a consciousness of guilt.

Additionally, the defendant gave inconsistent explanations as to where she had been during the period when the victim was killed. She told Cindy Edison that she had been out all night with "Chris" but told Perry Brasfield that she had been at home outside smoking a cigarette because she did not want him to know whom she was with. Following the defendant's arrest, Eidson again asked her where she had been at the time of the murder, and this time the defendant replied that she did not know where she had been or whom she had been with. She told Caroline Giovannetti that she had driven past her house at midnight, saw that the lights were out and, assuming her mother was asleep, went to the house of Eric Whitaker, and returned home around four or five a.m. and found the victim's body. She did not respond when Perry Brasfield asked where she had been during this period. To Regina Hunt, the defendant first said that she had sneaked out of the house that night, but later said that she had ridden by the house and decided not to go home because she had talked with the victim who was going to bed. The defendant then "got very defensive when [Hunt] corrected her that her story was different." Eric Sherwood, the defendant's uncle, testified that he asked the defendant more than once, while she was at Lakeside Hospital, if she any ideas about the victim's death, and she "basically just put her head down and wouldn't say anything." Sheila Cocke testified that, as she sat on the curb with the defendant, shortly after police officers had arrived at the crime scene, "different officers came up and would say something to [the defendant] and about where were you and so forth. And she never gave the same answer twice. . . . I thought, oh, my goodness. Oh, my goodness, . . . you better be able to come front and center with where you were."

On appeal, the defendant points to items of physical evidence which, she argues, at the least result in reasonable doubt as to the defendant's guilt and, at the most, show that the crime was committed by an unidentified person. However, all of this evidence was put before the jury, which, as evidenced by its verdict, reconciled any conflicts in favor of the State.

Based upon the defendant's supposedly not recalling, even a few hours after the crime, where she had been at the time of the victim's death, a jury reasonably could have inferred that she had a consciousness of guilt and an intent to deceive. Thus, we conclude that a rational trier of fact could have found from the evidence, beyond a reasonable doubt, the elements of second degree murder and, thus, that the evidence is sufficient to support the defendant's conviction.

## VII. Sentencing

On appeal, the defendant argues that, as to sentencing, the trial court erred by not requiring the State to provide due process with regard to the presentence report; by not concluding that she was an especially mitigated offender; and by imposing a sentence in excess of the statutory minimum. We will review these arguments.

Initially, the defendant asserts that the State did not provide a copy of the presentence report ten days prior to the sentencing hearing, as required by statute. The State responds that Tennessee Code Annotated section 40-35-202(a) requires the State to file a sentencing statement at least ten days prior to the trial only if it is seeking that the defendant be sentenced as a multiple, persistent, or career offender. We agree with the State's argument in this regard. The State sought to have the defendant sentenced within the range for a Range I, standard offender, which the trial court did. Accordingly, this claim is without merit.

Additionally, the defendant argues that the contents of the presentence report were hearsay and that the trial court erred in not requiring the author of the report, as well as any person whose information was contained in it, to testify at the sentencing hearing. However, Tennessee Code Annotated section 40-35-209(b) provides in pertinent part that, at a sentencing hearing, "reliable hearsay . . . may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." This court has consistently held that the presentence report is reliable hearsay. State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (information contained in a presentence report is reliable because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report). Accordingly, we conclude that the trial court could rely upon the presentence report even though its author did not testify at the hearing. The defendant argues, as well, that her interview for the presentence report amounted to a custodial interrogation, at which she had a right to counsel. The cases cited in support of this view consider the right to counsel regarding a pending criminal case, but not an interview after conviction for preparation of a presentence report. We decline to extend those holdings to such a situation.

In sentencing the defendant, the trial court found that one enhancement factor applied, that the defendant had prior adult criminal behavior, namely, that she had admitted, as reflected in the presentence report, that "she used drugs socially." Accordingly, based upon this one enhancement factor and no mitigating factors, the court enhanced the sentence by nine months, sentencing the defendant to serve twenty years and nine months.[6]

---

[6]Since the briefs were filed in this matter, our supreme court concluded in State v. Susan Renee Bise, ___ S.W.3d ___, 2012 WL 4380564, at *17 (Tenn. 2012), that the 2005 amendments to the Sentencing

(continued...)

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

The defendant argues that, in addition to not giving the required consideration to the 1989 Sentencing Act, the court erred in increasing her sentence by nine months because of the source of the information regarding her use of marijuana. According to the defendant's

---

[6](...continued)
Reform Act of 1989 "effectively abrogated the de novo standard of appellate review" and resulted in the court's adopting "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." However, since the compiler's notes to Tennessee Code Annotated section 40-35-114 state that the 2005 act applies to offenses occurring on or after June 7, 2005, the offense which is the basis for this appeal occurring before that date, and the defendant did not submit a waiver as to this amendment, the 1989 Sentencing Act applies to the sentencing in this matter.

argument, the court could rely upon this alleged fact only if it had been submitted to a jury and proven beyond a reasonable doubt. Accordingly, the sentencing violated the holdings of Apprendi v. New Jersey, 530 U.S. 466 (2000); Blakely v. Washington, 542 U.S. 296 (2004); and Cunningham v. California, 549 U.S. 270 (2007). However, in increasing the defendant's sentence by nine months, the trial court relied upon the holding of this court in State v. Anthony Riggs, No. M2007-02322-RM-CD, 2008 WL 1968826, at *4 (Tenn. Crim. App. May 7, 2008), that a "factual acknowledgment in the presentence report when the presentence report is introduced as an exhibit at the sentencing hearing without objection" may be the basis for a sentence enhancement. In this matter, the defendant objected to the presentence report, and the trial court made the additional finding that the use of marijuana as an adult was a "fact admitted by the defendant in the Pre-Sentence Report." We conclude that the record supports this determination.

Further, the defendant argues that the trial court erred in not sentencing her as an especially mitigated offender. In this regard, the State notes that Tennessee Code Annotated section 40-35-109, pursuant to which the defendant was sentenced, provides that a trial court has discretion as to whether a defendant is an especially mitigated offender. In concluding that the defendant was not within this category, the court explained that, considering the presentence report, the proof both at the sentencing and at trial, the sentencing principles and the arguments of counsel, and the fact that the defendant had committed the "brutal killing of a loved one, alleged loved one," the court could not "find at all that there's anything mitigating about this case much less especially mitigating." The record supports this determination of the trial court. Accordingly, we affirm the sentence imposed by the trial court.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE